

FILED

1  MICHAEL R. LOZEAU (State Bar No. 142893)
2  DOUGLAS J. CHERMAK (State Bar No. 233382)
   Law Office of Michael R. Lozeau
3  1516 Oak Street, Suite 216
   Alameda, CA 94501
4  Tel: (510) 749-9102
   Fax: (510) 749-9103 (fax)
5  E-mail: mrlozeau@lozeaulaw.com

6  ANDREW L. PACKARD (State Bar No. 168690)
   MICHAEL P. LYNES (State Bar No. 230462)
7  Law Offices of Andrew L. Packard
   319 Pleasant Street
8  Petaluma, CA 94952
   Tel: (707) 763-7227
9  Fax: (415) 763-9227
   E-mail: andrew@packardlawoffices.com **E-filing**
10

11 Attorneys for Plaintiff
   CALIFORNIA SPORTFISHING
12 PROTECTION ALLIANCE

13                **UNITED STATES DISTRICT COURT**

14              **NORTHERN DISTRICT OF CALIFORNIA**

15 CALIFORNIA SPORTFISHING          Case No. _____ 04484  BZ
   PROTECTION ALLIANCE, a non-profit
   corporation,
                                     **COMPLAINT FOR DECLARATORY
        Plaintiff,                   AND INJUNCTIVE RELIEF AND
                                     CIVIL PENALTIES**
        vs.
                                                                    ADR
   CONTRA COSTA WASTE SERVICE       (Federal Water Pollution Control Act,
   RECYCLING CENTER AND             33 U.S.C. §§ 1251 to 1387)
   TRANSFER STATION, a corporation.

        Defendant.

   CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its

   counsel, hereby alleges:

25 **I.    INTRODUCTION**

26     1.    This complaint seeks relief for Defendant's discharges of polluted storm water

27 and non-storm water pollutants from Defendant's facility ("the Facility") into the waters of

28 the United States in violation of the Act and the State of California's "Waste Discharge

COMPLAINT
                                        1

1 Requirements (WDRs) For Discharges of Storm Water Associated With Industrial Activities
2 Excluding Construction Activities," State Water Resources Control Board ("State Board")
3 Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ
4 and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System
5 ("NPDES") Permit No. CAS000001, (hereinafter "the Order" or "Permit"). Defendant's
6 violations of the discharge, treatment technology, monitoring requirements, and other
7 procedural and substantive requirements of the Permit and the Act are ongoing and
8 continuous.

9      2.      The failure on the part of persons and facilities such as Defendant and its
10 industrial facility to comply with storm water requirements is recognized as a significant
11 cause of the continuing decline in water quality of the Suisun Bay, San Francisco Bay
12 ("Bay"), and other area receiving waters. The general consensus among regulatory agencies
13 and water quality specialists is that storm pollution amounts to a substantial portion of the
14 total pollution entering the aquatic environment each year. With every rainfall event,
15 millions of gallons of polluted rainwater originating from industries within the surrounding
16 area pour into the Bay.

17      3.      The continuing decline in water quality in the San Francisco Bay is a matter of
18 serious public concern. Data gathered by CalFed, a coalition of fifteen state and federal
19 agencies analyzing water allocation issues, has confirmed that the Bay is a heavily polluted
20 water body. The entire Bay and all of its major tributaries have been identified by the State
21 Board, the Regional Board, and EPA as impaired water bodies under Section 303(d) of the
22 Clean Water Act. 33 U.S.C. § 1313(d).

23 **II.    JURISDICTION AND VENUE**

24      4.      This is a civil suit brought under the citizen suit enforcement provisions of the
25 Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or
26 "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter
27 of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28
28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is

COMPLAINT
                                                            2

**1** authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of

**2** actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§

**3** 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

**4**   5.   On or about May 18, 2007, Plaintiff provided notice of Defendant's violations

**5** of the Act, and of its intention to file suit against Defendant, to the Defendant; the

**6** Administrator of the United States Environmental Protection Agency ("EPA"); the

**7** Administrator of EPA Region IX; the Executive Director of the State Water Resources

**8** Control Board ("State Board"); and to the Executive Officer of the Regional Water Quality

**9** Control Board, San Francisco Bay Region ("Regional Board"). A true and correct copy of

**10** CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

**11**   6.   More than sixty days have passed since notice was served on Defendant and

**12** the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that

**13** neither the EPA nor the State of California has commenced or is diligently prosecuting a

**14** court action to redress the violations alleged in this complaint. This action's claim for civil

**15** penalties is not barred by any prior administrative penalty under Section 309(g) of the Act,

**16** 33 U.S.C. § 1319(g).

**17**   7.   Venue is proper in the Northern District of California pursuant to Section

**18** 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located

**19** within this judicial district. Pursuant to Local Rule 3-2(c), intradistrict venue is proper in

**20** Oakland, California because the sources of the violations are located within Contra Costa

**21** County, California.

**22** **III.   PARTIES**

**23**   8.   Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

**24** ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of

**25** California with its main office in Stockton, California. CSPA has approximately 2,000

**26** members who live, recreate and work in and around waters of the State of California,

**27** including Suisun Bay and San Francisco Bay. CSPA is dedicated to the preservation,

**28** protection, and defense of the environment, the wildlife and the natural resources of all

COMPLAINT

3

1   waters of California. To further these goals, CSPA actively seeks federal and state agency

2   implementation of the Act and other laws and, where necessary, directly initiates

3   enforcement actions on behalf of itself and its members.

4       9.      Members of CSPA reside in and around the Bay and enjoy using the Bay for

5   recreation and other activities. Members of CSPA use and enjoy the waters into which

6   Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.

7   Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife

8   and engage in scientific study including monitoring activities, among other things.

9   Defendant's discharges of pollutants threaten or impair each of those uses or contribute to

10  such threats and impairments. Thus, the interests of CSPA's members have been, are being,

11  and will continue to be adversely affected by Defendant's failure to comply with the Clean

12  Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused

13  by Defendant's activities.

14      10.     Plaintiff is informed and believes, and thereupon alleges, that Defendant

15  CONTRA COSTA WASTE SERVICE RECYCLING CENTER AND TRANSFER

16  STATION (hereinafter "Defendant" or "Recycling Center") is a corporation organized under

17  the laws of California. Defendant Recycling Center operates a recycling center and transfer

18  station in Pittsburg, California.

19  **IV.   STATUTORY BACKGROUND**

20      11.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

21  pollutant into waters of the United States, unless such discharge is in compliance with

22  various enumerated sections of the Act. Among other things, Section 301(a) prohibits

23  discharges not authorized by, or in violation of, the terms of an NPDES permit issued

24  pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

25      12.     Section 402(p) of the Act establishes a framework for regulating municipal and

26  industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States

27  with approved NPDES permit programs are authorized by Section 402(p) to regulate

28  industrial storm water discharges through individual permits issued to dischargers or through

COMPLAINT
                                                4

1  the issuance of a single, statewide general permit applicable to all industrial storm water
2  dischargers. 33 U.S.C. § 1342(p).

3      13.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the
4  U.S. EPA has authorized California's State Board to issue NPDES permits including general
5  NPDES permits in California.

6      14.    The State Board elected to issue a statewide general permit for industrial storm
7  water discharges. The State Board issued the General Permit on or about November 19,
8  1991, modified the General Permit on or about September 17, 1992, and reissued the
9  General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water
10  Act, 33 U.S.C. § 1342(p).

11     15.    In order to discharge storm water lawfully in California, industrial dischargers
12  must comply with the terms of the General Permit or have obtained and complied with an
13  individual NPDES permit. 33 U.S.C. § 1311(a).

14     16.    The General Permit contains several prohibitions. Effluent Limitation B(3) of
15  the General Permit requires dischargers to reduce or prevent pollutants in their storm water
16  discharges through implementation of the Best Available Technology Economically
17  Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional
18  Pollutant Control Technology ("BCT") for conventional pollutants. BAT and BCT include
19  both nonstructural and structural measures. General Permit, Section A(8). Discharge
20  Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-
21  storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.
22  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to
23  any surface or ground water that adversely impact human health or the environment.
24  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that
25  cause or contribute to an exceedance of any applicable water quality standards contained in a
26  Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

27     17.    EPA has established Parameter Benchmark Values as guidelines for
28  determining whether a facility discharging industrial storm water has implemented the

COMPLAINT
5

1  requisite BAT and BCT. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000). EPA has established

2  Parameter Benchmark Values for the following parameters, among others: total suspended

3  solids – 100 mg/L; pH – 6.0-9.0 s.u.; and oil/grease – 15 mg/L. The California State Water

4  Resources Control Board has proposed a Benchmark Value for electrical conductance of 200

5  μmhos/cm.

6      18.    In addition to absolute prohibitions, the General Permit contains a variety of

7  substantive and procedural requirements that dischargers must meet. Facilities discharging,

8  or having the potential to discharge, storm water associated with industrial activity that have

9  not obtained an individual NPDES permit must apply for coverage under the State's General

10  Permit by filing a Notice of Intent To Comply ("NOI"). The General Permit requires

11  existing dischargers to have filed their NOIs before March 30, 1992.

12      19.    Dischargers must develop and implement a Storm Water Pollution Prevention

13  Plan ("SWPPP"). The SWPP must describe storm water control equipment and measures

14  that comply with the BAT and BCT standards. The General Permit requires that an initial

15  SWPPP have been developed and implemented before October 1, 1992. The SWPPP must,

16  among other requirements, identify and evaluate sources of pollutants associated with

17  industrial activities that may affect the quality of storm and non-storm water discharges from

18  the facility and identify and implement site-specific best management practices ("BMPs") to

19  reduce or prevent pollutants associated with industrial activities in storm water and

20  authorized non-storm water discharges (Section A(2)). The SWPPP's BMPs must

21  implement BAT and BCT (Section B(3)). The SWPPP must include: a description of

22  individuals and their responsibilities for developing and implementing the SWPP (Section

23  A(3)); a site map showing the facility boundaries, storm water drainage areas with flow

24  pattern and nearby water bodies, the location of the storm water collection, conveyance and

25  discharge system, structural control measures, impervious areas, areas of actual and potential

26  pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials

27  handled and stored at the site (Section A(5)); a description of potential pollutant sources

28  including industrial processes, material handling and storage areas, dust and particulate

COMPLAINT

1 generating activities, and a description of significant spills and leaks, a list of all non-storm
2 water discharges and their sources, and a description of locations where soil erosion may
3 occur (Section A(6)). The SWPPP must include an assessment of potential pollutant sources
4 at the Facility and a description of the BMPs to be implemented at the Facility that will
5 reduce or prevent pollutants in storm water discharges and authorized non-storm water
6 discharges, including structural BMPs where non-structural BMPs are not effective (Section
7 A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where
8 necessary (Section A(9),(10)).

9    20.    Section C(11)(d) of the General Permit's Standard Provisions requires
10 dischargers to report any noncompliance to the Regional Board. *See also* Section E(6).
11 Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water
12 controls including the preparation of an evaluation report and implementation of any
13 additional measures in the SWPPP to respond to the monitoring results and other inspection
14 activities.

15    21.    The General Permit requires dischargers commencing industrial activities
16 before October 1, 1992 to develop and implement an adequate written monitoring and
17 reporting program no later than October 1, 1992. Existing facilities covered under the
18 General Permit had to implement all necessary revisions to their monitoring programs no
19 later than August 1, 1997.

20    22.    As part of their monitoring program, dischargers must identify all storm water
21 discharge locations that produce a significant storm water discharge, evaluate the
22 effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control
23 measures set out in the SWPPP are adequate and properly implemented. Dischargers must
24 conduct visual observations of these discharge locations for at least one storm per month
25 during the wet season (October through May) and record their findings in their Annual
26 Report. Dischargers must also collect and analyze storm water samples from at least two
27 storms per year. Section B(5)(a) of the General Permit requires that dischargers "shall
28 collect storm water samples during the first hour of discharge from (1) the first storm event

COMPLAINT                                         7

1   of the wet season, and (2) at least one other storm event in the wet season. All storm water

2   discharge locations shall be sampled." Section B(5)(c)(i)-(iii) requires dischargers to sample

3   and analyze during the wet season for basic parameters, such as pH, total suspended solids

4   ("TSS"), electrical conductance, and total organic content ("TOC") or oil and grease

5   ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants

6   likely to be in the storm water discharged from the facility. Dischargers must also conduct

7   dry season visual observations to identify sources of non-storm water pollution.

8       23.    Section B(14) of the General Permit requires dischargers to submit an annual

9   report by July 1 of each year to the executive officer of the relevant Regional Board. The

10   annual report must be signed and certified by an appropriate corporate officer. Sections

11   B(14), C(9), (10). Section A(9)(d) of the General Permit requires the discharger to include

12   in their annual report an evaluation of their storm water controls, including certifying

13   compliance with the General Permit. *See also* Sections C(9) and (10) and B(14).

14       24.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen

15   enforcement actions against any "person," including individuals, corporations, or

16   partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f),

17   § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. §

18   1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to

19   $27,500 per day (violations from January 30, 1997 through March 15, 2004) and $32,500

20   per day (violations after March 15, 2004) pursuant to Sections 309(d) and 505 of the Act, 33

21   U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

22       25.    The Regional Board has established water quality standards for the San

23   Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally

24   referred to as the Basin Plan.

25       26.    The Basin Plan provides that "[w]aters shall not contain suspended material in

26   concentrations that cause nuisance or adversely affect beneficial uses" and that "[w]aters

27   shall not contain biostimulatory substances in concentrations that promote aquatic growths to

28   the extent that such growths cause nuisance or adversely affect beneficial uses."

COMPLAINT

**1**   27.    The Basin Plan dictates that "[w]aters shall be free of changes in turbidity that
**2** cause nuisance or adversely affect beneficial uses."

**3**   28.    The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes,
**4** or other materials in concentrations that result in a visible film or coating on the surface of
**5** the water or on objects in the water, that cause nuisance, or that otherwise adversely affect
**6** beneficial uses."

**7**   29.    The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor
**8** raised above 8.5."

**9**   **V.    STATEMENT OF FACTS**

**10**   30.    Defendant Recycling Center operates a recycling center and transfer station at
**11** 1300 Loveridge Road in Pittsburg, California.  The Facility is engaged in storing,
**12** processing, and trucking various materials.  The Facility falls within the Standard Industrial
**13** Classification ("SIC") Code 4212.  The Facility covers about 11.7 acres, the majority of
**14** which is paved and used for storing and processing different types of metal, plastics,
**15** construction material, wood chips, and other materials, including large forklifts, trucks, and
**16** other vehicles.  On information and belief, Plaintiff alleges that there are several buildings
**17** located on the property.  On information and belief, Plaintiff alleges that recycling and
**18** processing is conducted both inside and outside of these buildings.  Materials are transported
**19** in and out of these buildings for storage in the paved and unpaved areas of the Facility.

**20**   31.    Defendant channels and collects storm water falling on the Facility though one
**21** storm water outfall.  Storm water discharged from the outfall enters a channel behind the
**22** facility.  The channel is a tributary to the Suisun Bay.

**23**   32.    The industrial activities at the site include the storage, processing, and transfer
**24** of a variety of materials including construction material and debris, hazardous material,
**25** metal, organic material, paper, plastic, and other materials.  It also includes the storage and
**26** maintenance of trucks used to transfer and dispose of these materials.

**27**   33.    Significant activities at the site take place outside and are exposed to rainfall.
**28** These activities include the storage and processing of the numerous types of materials

COMPLAINT
9

**1** handled by the Facility; the storage and use of vehicles and equipment for materials
**2** handling; and the storage, handling, and disposal of waste materials. Loading and delivery
**3** of materials occurs both inside and outside. Trucks enter and exit the Facility directly from
**4** and to a public road. Trucks are the primary means of moving materials around the unpaved
**5** storage areas of the Facility. Plaintiff is informed and believes, and thereupon alleges, that
**6** recycling and transfer activities also occur in exposed areas at the Facility. The Facility's
**7** exposed areas contain large piles of a variety of materials. Plaintiff alleges on information
**8** and belief that many of the exposed surfaces at the Facility are unpaved and sediment and
**9** other materials are disturbed as a result of the recycling, storage, and transfer processes.
**10** These areas are exposed to storm water and storm flows due to the lack of overhead
**11** coverage, berms and other storm water controls.

**12** 34. Industrial machinery, heavy equipment and vehicles, including trucks and
**13** trailers are operated and stored at the Facility in areas exposed to storm water flows. Plaintiff
**14** is informed and believes, and thereupon alleges, that such machinery and equipment leak
**15** contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are exposed
**16** to storm water flows.

**17** 35. Plaintiff is informed and believes, and thereupon alleges that the storm water
**18** flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease,
**19** and other pollutants as it flows toward the storm water drain. Storm water and any
**20** pollutants contained in that storm water entering the drain flows directly to the channel
**21** behind the Facility.

**22** 36. The management practices at the Facility are wholly inadequate to prevent the
**23** sources of contamination described above from causing the discharge of pollutants to waters
**24** of the United States. The Facility lacks sufficient structural controls such as grading,
**25** berming, roofing, containment, or drainage structures to prevent rainfall and storm water
**26** flows from coming into contact with these and other exposed sources of contaminants. The
**27** Facility lacks sufficient structural controls to prevent the discharge of water once
**28** contaminated. The Facility lacks adequate storm water pollution treatment technologies to

COMPLAINT
10

1  treat storm water once contaminated.

2   37.   Since at least December 13, 2002, Defendant has taken samples or arranged for
3  samples to be taken of storm water discharges at the Facility. The sample results were
4  reported in the Facility's annual reports submitted to the Regional Board. Defendant
5  Recycling Center certified each of those annual reports pursuant to Sections A and C of the
6  General Permit.

7   38.   Since at least December 13, 2002, the Facility has detected total suspended
8  solids, oil and grease, excess pH, and electrical conductance in storm water discharged from
9  the Facility. Levels of these pollutants detected in the Facility's storm water have been in
10  excess of EPA's numeric parameter benchmark values. Levels of these pollutants detected
11  in the Facility's storm water have been in excess of water quality standards established in the
12  Basin Plan.

13   39.   The levels of total suspended solids in storm water detected by the Facility
14  have exceeded the benchmark value for total suspended solids of 100 mg/L established by
15  EPA. For example, on January 7, 2005, the level of suspended solids measured by
16  Defendant in the Facility's discharged storm water was 16,500 mg/L. That level of total
17  suspended solids is 165 times the benchmark value for suspended solids established by EPA.

18   40.   The levels of oil and grease in storm water detected by the Facility have
19  exceeded the benchmark value for oil and grease of 15 mg/L established by EPA. For
20  example, on March 20, 2006, the level of oil and grease measured by Defendant in the
21  Facility's discharged storm water was 110 mg/L. That level of oil and grease is over seven
22  times the benchmark value for oil and grease established by EPA.

23   41.   The levels of pH in storm water detected by the Facility have exceeded the
24  benchmark value for pH of 6.0-9.0 s.u established by EPA. On January 7, 2005, the level of
25  pH measured by Defendant in the Facility's discharged storm water was 9.71 s.u.

26   42.   The electrical conductance levels detected by the Facility in its storm water
27  have been greater than the numeric water quality standards applicable to electrical
28  conductance in California. The electrical conductance levels detected by the Facility in its

COMPLAINT
11

1   storm water have been greater than the benchmark value of 200 μmho/cm proposed by the
2   State Board. For example, on March 20, 2006, the electrical conductance level measured by
3   Defendant in the Facility's discharged storm water was 821 μmho/cm. That electrical
4   conductance level is more than four times the State Board's proposed benchmark value.

5   43.   On information and belief, Plaintiff alleges that Defendants have failed to
6   conduct visual observations of storm water discharges from every discharge location at the
7   Facility at least once per month during each wet season since 2002-2003 in violation of
8   Section B(4) of the General Permit.

9   44.   On information and belief, Plaintiff alleges that since at least December 13,
10   2002, Defendant has failed to implement BAT and BCT at the Facility for its discharges of
11   suspended solids, pH, electrical conductance, oil and grease, and other pollutants. Section
12   B(3) of the General Permit requires that Defendant implement BAT for toxic and
13   nonconventional pollutants and BCT for conventional pollutants by no later than October 1,
14   1992. As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

15   45.   On information and belief, Plaintiff alleges that since at least October 1, 1992,
16   Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan
17   ("SWPPP") for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the
18   SWPPP prepared for the Facility does not set forth site-specific best management practices
19   for the Facility that are consistent with BAT or BCT for the Facility. Plaintiff is informed
20   and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not
21   include an assessment of potential pollutant sources, structural pollutant control measures
22   employed by the Defendant, a list of actual and potential areas of pollutant contact, or a
23   description of best management practices to be implemented at the Facility to reduce
24   pollutant discharges. According to information available to CSPA, Defendant's SWPPP has
25   not been evaluated to ensure effectiveness and revised where necessary to further reduce
26   pollutant discharges. Plaintiff is informed and believes, and thereupon alleges, that the
27   SWPPP does not include each of the mandatory elements required by Section A of the
28   General Permit. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP

COMPLAINT
12

1  does not contain an accurate map that clearly delineates the boundaries of the Facility.

2  46. Information available to CSPA indicates that as a result of these practices,
3  storm water containing excessive pollutants is being discharged during rain events from the
4  Facility directly to a channel that flows into Suisun Bay. Suisun Bay is a part of San
5  Francisco Bay.

6  47. The San Francisco Bay has been identified by the Regional Board, State Board
7  and federal EPA as impaired for several pollutants, including mercury and unknown toxicity.

8  48. Plaintiff is informed and believes, and thereupon alleges, that pollutants
9  discharged by the Facility in its storm water are contributing to violations of water quality
10  standards that apply to the San Francisco Bay and its tributaries. Plaintiff is informed and
11  believes, and thereupon alleges, that Defendant is discharging suspended solids, oil and
12  grease, pH and other un-monitored pollutants that are causing or contributing to exceedances
13  of applicable water quality standards. Defendant is contributing to violations of water
14  quality standards including, but not limited to, the narrative water quality standard for
15  toxicity and the numeric water quality standard for electrical conductance.

16  49. Plaintiff is informed and believes, and thereupon alleges, that, Defendant has
17  failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent
18  with Section A(9) of the General Permit.

19  50. Plaintiff is informed and believes that Defendant failed to submit to the
20  Regional Board a true and complete annual report certifying compliance with the General
21  Permit since at least December 13, 2002. Pursuant to Sections A(9)(d), B(14), and C(9),
22  (10) of the General Permit, Defendant must submit an annual report, that is signed and
23  certified by the appropriate corporate officer, outlining the Facility's storm water controls
24  and certifying compliance with the General Permit. Plaintiff is informed and believes, and
25  thereupon alleges, that Defendant has signed incomplete annual reports that purported to
26  comply with the General Permit when there was significant noncompliance at the Facility.

27  51. Information available to Plaintiff indicates that Defendant has not fulfilled the
28  requirements set forth in the General Permit for discharges from the Facility due to the

COMPLAINT
13

1  continued discharge of polluted storm water. Plaintiff is informed and believes, and

2  thereupon alleges, that all of the violations alleged in this Complaint are ongoing and

3  continuing.

4  **VI.    CLAIMS FOR RELIEF**

5  **FIRST CAUSE OF ACTION**

6  **Failure to Develop and Implement the Best Available and<br>Best Conventional Treatment Technologies**

7  **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

   52.    Plaintiff realleges and incorporate Paragraphs 1-51, as if fully set forth herein.

8  53.    The General Permit's SWPPP requirements and Effluent Limitation B(3)

9  require dischargers to reduce or prevent pollutants in their storm water discharges through

10 implementation of BAT for toxic and nonconventional pollutants and BCT for conventional

11 pollutants. Defendant has failed to implement BAT and BCT at the Facility for its

12 discharges of suspended solids, pH, electrical conductance, oil and grease, and other un-

13 monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

14 54.    Each day since October 1, 1992 that Defendant has failed to develop and

15 implement BAT and BCT in violation of the General Permit is a separate and distinct violation

16 of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

17 55.    Defendant has been in violation of the BAT/BCT requirements every day since

18 October 1, 1992. Defendant continues to be in violation of the BAT/BCT requirements each

19 day that it fails to develop and fully implement an adequate BAT/BCT for the Facility.

20 **SECOND CAUSE OF ACTION**

21 **Failure to Prepare, Implement, Review, and Update<br>an Adequate Storm Water Pollution Prevention Plan**

22 **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

23 56.    Plaintiff realleges and incorporate Paragraphs 1-55, as if fully set forth herein.

24 57.    Section A and Provision E of the General Permit requires dischargers of storm

25 water associated with industrial activity to have developed and be implementing an adequate

26 SWPPP no later than October 1, 1992.

27 58.    Defendant has failed to develop and implement an adequate SWPPP for the

28 Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the

COMPLAINT
                                                    14

1  Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various materials, without

2  appropriate best management practices; the continued exposure of significant quantities of

3  various materials to storm water flows; the continued exposure and tracking of waste resulting

4  from the operation or maintenance of vehicles at the site; the failure to either treat storm water

5  prior to discharge or to implement effective containment practices; and the continued

6  discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark

7  values.

8      59.    Defendant has failed to update the Facility's SWPPP in response to the

9  analytical results of the Facility's storm water monitoring.

10     60.    Each day since October 1, 1992 that Defendant has failed to develop, implement

11  and update an adequate SWPPP for the Facility is a separate and distinct violation of Section

12  301(a) of the Act, 33 U.S.C. § 1311(a).

13     61.    Defendant has been in violation of the SWPPP requirements every day since

14  October 1, 1992.  Defendant continues to be in violation of the SWPPP requirements each day

15  that it fails to develop and fully implement an adequate SWPPP for the Facility.

16                          **THIRD CAUSE OF ACTION**
   **Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
17       **(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

18     62.    Plaintiff re-alleges and incorporates Paragraphs 1-61, inclusive, as if fully set

19  forth herein.

20     63.    Section B of the General Permit requires dischargers of storm water associated

21  with industrial activity to have developed and be implementing a monitoring and reporting

22  program (including, *inter alia*, sampling and analysis of discharges) no later than October 1,

23  1992.

24     64.    Defendant has failed to develop and implement an adequate monitoring and

25  reporting program for the Facility.  Defendant's ongoing failure to develop and implement

26  an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to

27  conduct monthly visual observations of storm water discharges.

28     65.    Each day since October 1, 1992 that Defendant has failed to develop and

COMPLAINT
                                    15

**1** implement an adequate monitoring and reporting program for the Facility in violation of the

**2** General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

**3** 1311(a). The absence of requisite monitoring and analytical results are ongoing and

**4** continuous violations of the Act.

**5**

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

**6**

**7**

**8** 66.    Plaintiff re-alleges and incorporates Paragraphs 1-65, inclusive, as if fully set
forth herein.

**9**

**10** 67.    Discharge Prohibition A(2) of the General Permit requires that storm water

discharges and authorized non-storm water discharges shall not cause or threaten to cause

**11** pollution, contamination, or nuisance. Receiving Water Limitations C(1) and C(2) of the

**12** General Permit require that storm water discharges and authorized non-storm water discharges

**13** shall not adversely impact human health or the environment, and shall not cause or contribute

**14** to a violation of any water quality standards contained in a Statewide Water Quality Control

**15** Plan or the applicable Regional Board's Basin Plan.

**16**
68.    Plaintiff is informed and believes, and thereupon alleges, that since at least

**17** December 13, 2002, Defendant has been discharging polluted storm water from the Facility

**18** directly to channels or storm drains that flow into the Suisun Bay and the San Francisco Bay,

**19** in violation of the Discharge Prohibition A(2) of the General Permit.

**20**
69.    During every rain event, rainwater flows freely over exposed materials, waste

**21** products, and other accumulated pollutants at the Facility, becoming contaminated with these

**22** pollutants. The rainwater then flows untreated from the Facility into a channel or storm drain.

**23** This contaminated storm water flows into Suisun Bay, a part of the San Francisco Bay.

**24**
70.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

**25** contaminated storm water are causing pollution and contamination of the waters of the United

**26** States in violation of Discharge Prohibition A(2) of the General Permit.

**27**
71.    Plaintiff is informed and believes, and thereupon alleges, that these discharges

**28**

COMPLAINT

16

1   of contaminated storm water are adversely affecting human health and the environment in

2   violation of Receiving Water Limitation C(1) of the General Permit.

3       72.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of

4   contaminated storm water are contributing to the violation of the applicable water quality

5   standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's

6   Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

7       73.     Every day since at least December 13, 2002, that Defendant has discharged and

8   continues to discharge polluted storm water from the Facility in violation of the General Permit

9   is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These

10  violations are ongoing and continuous.

11                              **FIFTH CAUSE OF ACTION**
                    **False Certification of Compliance In Annual Report**
12         **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

13      74.     Plaintiff realleges and incorporate Paragraphs 1-73, as if fully set forth herein.

14      75.     Defendant has falsely certified compliance with the General Permit in each of

15  the annual reports submitted to the Regional Board since at least June 2002.

16      76.     Each day since at least June 26, 2002 that Defendant has falsely certified

17  compliance with the General Permit is a separate and distinct violation of the General Permit

18  and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of

19  the General Permit's certification requirement each day that it maintains its false certification

20  of its compliance with the General Permit.

21  **VII.    RELIEF REQUESTED**

22          Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

23          a.  Declare Defendant to have violated and to be in violation of the Act as

24  alleged herein;

25          b.  Enjoin Defendant from discharging polluted storm water from the Facility

26  unless authorized by the Permit;

27          c.  Enjoin Defendant from further violating the substantive and procedural

28  requirements of the Permit;

COMPLAINT
                                        17

1    d.  Order Defendant to immediately implement storm water pollution control

2  and treatment technologies and measures that are equivalent to BAT or BCT and prevent

3  pollutants in the Facility's storm water from contributing to violations of any water quality

4  standards;

5    e.  Order Defendant to comply with the Permit's monitoring and reporting

6  requirements, including ordering supplemental monitoring to compensate for past monitoring

7  violations;

8    f.  Order Defendant to prepare a SWPPP consistent with the Permit's

9  requirements and implement procedures to regularly review and update the SWPPP;

10    g.  Order Defendant to provide Plaintiff with reports documenting the quality

11  and quantity of their discharges to waters of the United States and their efforts to comply with

12  the Act and the Court's orders;

13    h.  Order Defendant to pay civil penalties of $27,500 per day per violation for

14  all violations occurring before March 15, 2004, and $32,500 per day per violation for all

15  violations occurring after August 28, 2002, for each violation of the Act pursuant to Sections

16  309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

17    i.  Order Defendant to take appropriate actions to restore the quality of waters

18  impaired or adversely affected by their activities;

19    j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness,

20  compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

21    k.  Award any such other and further relief as this Court may deem appropriate.

22

23  Dated: August 28, 2007          Respectfully submitted,

24                                 LAW OFFICE OF MICHAEL R. LOZEAU

25

26                         By:  _____

27                                 Douglas J. Chermak
                                   Attorney for Plaintiff
                                   CALIFORNIA SPORTFISHING PROTECTION
28                                 ALLIANCE

COMPLAINT

18

# EXHIBIT A

# California Sportfishing Protection Alliance

*" An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

May 16, 2007

Silvio Garaventa, Jr., Vice President
Contra Costa Waste Service
P.O. Box 5397
Concord, CA 94520

Jim Nejedly, Operations Manager
Recycling Center and Transfer Station
1300 Loveridge Road
Pittsburg, CA 94565

Mary Garaventa
Agent for Service of Process
4080 Mallard Dr.
Concord, CA 94520

## Re:    Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act

Dear Messrs. Garaventa, Jr., Nejedly and Ms. Garanventa:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("Act") that CSPA believes are occurring at the Recycling Center and Transfer Station located at 1300 Loveridge Road in Pittsburg, California ("Facility"). CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the Sacramento River, San Joaquin River, the Sacramento-San Joaquin River Delta ("the Delta"), San Francisco Bay and other California waters. This letter is being sent to you as the responsible owners, officers, or operators of the Recycling Center and Transfer Station (all recipients are hereinafter collectively referred to as "Recycling Center").

This letter addresses Recycling Center's unlawful discharge of pollutants from the Facility to waters of the United States. According to the Facility's NOI, it discharges to the City of Pittsburg's municipal storm sewer system and Kirker Creek, which then flow into the San Joaquin River, the Delta and Suisun Bay. The facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State

Water Resources Control Board, Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit"). The WDID identification number for the Facility listed on documents submitted to the State Board and California Regional Water Quality Control Board ("Regional Board") is 2-07S011211. The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violations and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Recycling Center is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violations and Intent to Sue, CSPA intends to file suit in federal court against Recycling Center, Silvio Garaventa, Jr., and Jim Nejedly under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Order. These violations are described more extensively below.

## I.    Background.

On or about August 20, 1997, Recycling Center filed its Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). Recycling Center certified that the Facility is classified under SIC code 4212 ("trucking without storage"). According to the Recycling Center's NOI, the Facility collects and discharges storm water from its 11.7 acre industrial site into one storm drain outlet located at the Facility. Recycling Center discharges storm water to a vegetated channel that, according to the Facility's NOI, is then discharged either to Kirker Creek and the Pittsburg storm drains or both, which then empties into Suisun Bay and the western edge of the Delta.

The Central Valley Regional Water Quality Control Board has identified waters of the Delta as failing to meet water quality standards for unknown toxicity, electrical conductivity, numerous pesticides and mercury. *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf.

The San Francisco Bay Regional Water Quality Control Board (the "Regional Board" or "Board") has established water quality standards for the San Francisco Bay, including Kirker Creek and Suisun Bay, in the "Water Quality Control Plan for the San Francisco Bay Basin," generally referred to as the Basin Plan. *See* http://www.swrcb.ca.gov/rwqcb2/basinplan.htm. The beneficial uses of the Bay region's waters, including Kirker Creek and Suisun Bay, include among others contact and non-contact recreation, municipal and domestic water supply, endangered and threatened species habitat, shellfish harvesting, and fish spawning. The non-contact recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, . . ., camping, boating, . . ., hunting, sightseeing, or aesthetic enjoyment in conjunction with the

Notice of Violations and Intent to File Suit

Recycling Center
May 16, 2007
Page 3 of 10

above activities." Basin Plan at 2.1.16. Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of Suisin Bay, Kirker Creek, and the San Joaquin River and Delta for contact and noncontact water recreation. Pollutant discharges of, for example, high suspended solids and other pollutants in industrial storm water also contribute to the existing impairments of Kirker Creek and the Suisun Bay, including unknown toxicity, high electrical conductivity and low dissolved oxygen.

The Regional Board has established water quality standards for Suisin Bay and its tributaries. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce significant alterations in population or community ecology or receiving water biota." *Id.* at 3.3.8. The Basin Plan also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." *Id.* at 3.3.9. It prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." *Id.* at 3.3.7. The Basin Plan establishes a dissolved oxygen standard of 7.0 mg/L for waters upstream from the Carquinez Bridge. *Id.* at 3.3.5. It limits floating material, stating that "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.6. The Basin Plan incorporates the objectives contained in the State Water Board's 1995 "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary" (*Id.* at 3.5), which establishes a standard for electrical conductivity in the Delta of 0.45 mmhos/cm from April 1 through August 31, as well as less stringent standards for various low flow conditions.

The U.S. Environmental Protection Agency ("EPA") has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Recycling Center: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L, oil & grease ("O&G") – 15 mg/L, aluminum – .75 mg/L, zinc – 0.117 mg/L, iron – 1 mg/L, nitrate + nitrite nitrogen ("N+N") – 0.68 mg/L. The State Water Quality Control Board also has proposed adding a benchmark level to the General Permit for specific conductance (200 μmho/cm).

## II.   Alleged Violations of the NPDES Permit.

### A.   *Discharges in Violation of the Permit.*

Recycling Center has violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water

Recycling Center
May 16, 2007
Page 4 of 10

discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD"), and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Recycling Center has discharged and continues to discharge storm water with unacceptable levels of total suspended solids, specific conductivity, pH, and other pollutants in violation of the General Permit. Recycling Center's sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Concentration | Objective | Benchmark |
|------|-----------|---------------|-----------|-----------|
| 3/20/2006 | TSS | 1190 mg/L | Narrative | 100 mg/L |
| 3/20/2006 | Specific Conductivity | 821 µmho/cm | Narrative | 200 µmho/cm (proposed) |
| 3/20/2006 | O&G | 110 mg/L | Narrative | 15 mg/L |
| 12/1/2005 | TSS | 1870 mg/L | Narrative | 100 mg/L |
| 3/22/2005 | TSS | 1320 mg/L | Narrative | 100 mg/L |
| 3/22/2005 | Specific Conductivity | 670 µmho/cm | Narrative | 200 µmho/cm (proposed) |
| 3/22/2005 | O&G | 32 mg/L | Narrative | 15 mg/L |
| 1/7/2005 | pH | 9.71 | Narrative | 6.0 – 9.0 |
| 1/7/2005 | TSS | 16500 mg/L | Narrative | 100 mg/L |

Notice of Violations and Intent to File Suit

Recycling Center
May 16, 2007
Page 5 of 10

| 1/7/2005 | Specific Conductivity | 448 µmho/cm | Narrative | 200 µmho/cm (proposed) |
|----------|----------------------|-------------|-----------|------------------------|
| 2/16/2004 | TSS | 770 mg/L | Narrative | 100 mg/L |
| 2/16/2004 | Specific Conductivity | 230 µmho/cm | Narrative | 200 µmho/cm (proposed) |
| 12/5/2003 | TSS | 340 mg/L | Narrative | 610 mg/L |
| 12/13/2002 | TSS | 740 mg/L | Narrative | 100 mg/L |
| 12/13/2002 | Specific Conductivity | 450 µmho/cm | Narrative | 200 µmho/cm (proposed) |

CSPA's investigation, including its review of Recycling Center's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that Recycling Center has not implemented BAT and BCT at the Facility for its discharges of TSS, specific conductivity, O&G, pH and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. Recycling Center was required to have implemented BAT and BCT by no later than October 1, 1992. Thus, Recycling Center is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT. In addition, the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every significant rain event that has occurred since May 16, 2002, and that will occur at the Facility subsequent to the date of this Notice of Violations and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Recycling Center has discharged storm water containing impermissible levels of TSS, O&G, specific conductivity, and pH in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water to each storm drain at or adjacent to the Facility containing any of these pollutants constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Recycling Center is subject to penalties for violations of the General Permit and the Act since May 16, 2002.

**B.    *Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.***

Section A(1) and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the General Permit to continue following their existing SWPPP and implement any necessary

Recycling Center
May 16, 2007
Page 6 of 10

revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's investigation of the conditions at the Facility as well as Recycling Center's Annual Reports indicate that Recycling Center has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Recycling Center has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Recycling Center has been in continuous violation of Section A and Provision E(2) of the General Permit every day since at least May 16, 2002, and will continue to be in violation every day that Recycling Center fails to develop and implement an effective SWPPP. Recycling Center is subject to penalties for violations of the Order and the Act occurring since May 16, 2002.

### C.    Failure to Conduct Monthly Visual Observations of Storm Water Discharges

Section B(4)(a) of the General Permit requires dischargers of storm water to conduct visual observations of storm water discharges for one storm event per month during the wet season. The observations must take place during the first hour of the discharge. Section B(4)(b) indicates that the observations are only required of discharges that occur during scheduled facility operating hours and during daylight hours preceded by three working days without storm water discharges. Section B(4)(c) requires the SWPPP to be revised based on the observations and implemented in accordance with Section A of the General Permit (described above). Based

Notice of Violations and Intent to File Suit

on information and belief, Recycling Center has failed to conduct visual observations of storm water discharges during qualifying storm events for the following months: November, 2002; December, 2002; January, 2003; March, 2003; April, 2003; November, 2003; February, 2004; March, 2004; May, 2004; October, 2004; November, 2004; February, 2005; May, 2005; November, 2005; March, 2006; April, 2006; May, 2006.

### D.    *Failure to File True and Correct Annual Reports.*

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

For at least the last five years, Recycling Center and its agent, Jim Nejedly, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit. Consequently, Recycling Center and Mr. Nejedly have violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Recycling Center or its agent failed to submit a complete or correct report and every time Recycling Center or its agents falsely purported to comply with the Act. Recycling Center is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since July 1, 2002.

### IV.    Persons Responsible for the Violations.

CSPA puts Recycling Center, Silvio Garaventa, Jr., and Jim Nejedly on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Recycling Center, Silvio Garaventa, Jr., and Jim Nejedly on notice that it intends to include those subsequently identified persons in this action.

### V.    Name and Address of Noticing Party.

Our name, address and telephone number is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, CA 95204
Tel. (209) 464-5067

### VI.    Counsel.

Notice of Violations and Intent to File Suit

CSPA has retained legal counsel to represent it in this matter. Please direct all communications to:

Michael R. Lozeau
Douglas J. Chermak
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, California 94501
Tel. (510) 749-9102
mrlozeau@lozeaulaw.com

Andrew L. Packard
Michael Lynes
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, California 94952
Tel. (707) 763-7227
andrew@packardlawoffices.com

## VII.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Recycling Center to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the Act against Recycling Center and its agents for the above-referenced violations upon the expiration of the 60-day notice period. However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Tom Howard, Acting Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Alberto Gonzalez, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

## ATTACHMENT A
### Rain Dates, Recycling Center, Pittsburg, CA

| Month | Day | Year | Month | Day | Year | Month | Day | Year |
|---|---|---|---|---|---|---|---|---|
| | | | February | 26 | 2004 | December | 21 | 2005 |
| November | 07 | 2002 | March | 01 | 2004 | December | 22 | 2005 |
| December | 09 | 2002 | May | 28 | 2004 | December | 25 | 2005 |
| December | 14 | 2002 | October | 19 | 2004 | December | 27 | 2005 |
| December | 16 | 2002 | October | 23 | 2004 | December | 28 | 2005 |
| December | 20 | 2002 | October | 24 | 2004 | December | 30 | 2005 |
| December | 21 | 2002 | November | 03 | 2004 | December | 31 | 2005 |
| December | 27 | 2002 | November | 09 | 2004 | January | 01 | 2006 |
| December | 30 | 2002 | November | 10 | 2004 | January | 02 | 2006 |
| January | 09 | 2003 | November | 11 | 2004 | January | 18 | 2006 |
| January | 10 | 2003 | December | 06 | 2004 | January | 30 | 2006 |
| January | 21 | 2003 | December | 07 | 2004 | February | 17 | 2006 |
| March | 14 | 2003 | December | 08 | 2004 | February | 26 | 2006 |
| March | 16 | 2003 | December | 27 | 2004 | February | 27 | 2006 |
| March | 22 | 2003 | December | 28 | 2004 | March | 02 | 2006 |
| April | 03 | 2003 | December | 29 | 2004 | March | 03 | 2006 |
| April | 12 | 2003 | December | 30 | 2004 | March | 06 | 2006 |
| May | 02 | 2003 | December | 31 | 2004 | March | 11 | 2006 |
| May | 03 | 2003 | January | 01 | 2005 | March | 13 | 2006 |
| August | 21 | 2003 | January | 02 | 2005 | March | 17 | 2006 |
| November | 06 | 2003 | January | 06 | 2005 | March | 18 | 2006 |
| November | 08 | 2003 | January | 07 | 2005 | March | 21 | 2006 |
| November | 15 | 2003 | January | 08 | 2005 | March | 25 | 2006 |
| November | 30 | 2003 | January | 10 | 2005 | March | 28 | 2006 |
| December | 01 | 2003 | January | 11 | 2005 | March | 29 | 2006 |
| December | 04 | 2003 | January | 25 | 2005 | April | 03 | 2006 |
| December | 06 | 2003 | January | 27 | 2005 | April | 04 | 2006 |
| December | 09 | 2003 | February | 14 | 2005 | April | 05 | 2006 |
| December | 10 | 2003 | February | 15 | 2005 | April | 11 | 2006 |
| December | 13 | 2003 | February | 17 | 2005 | April | 12 | 2006 |
| December | 19 | 2003 | February | 19 | 2005 | April | 13 | 2006 |
| December | 22 | 2003 | February | 20 | 2005 | April | 17 | 2006 |
| December | 23 | 2003 | February | 26 | 2005 | May | 21 | 2006 |
| December | 24 | 2003 | February | 27 | 2005 | November | 01 | 2006 |
| December | 26 | 2003 | March | 01 | 2005 | November | 03 | 2006 |
| December | 28 | 2003 | March | 03 | 2005 | November | 10 | 2006 |
| December | 29 | 2003 | March | 18 | 2005 | December | 14 | 2006 |
| January | 01 | 2004 | March | 19 | 2005 | December | 21 | 2006 |
| January | 02 | 2004 | March | 21 | 2005 | January | 28 | 2007 |
| January | 06 | 2004 | March | 22 | 2005 | February | 08 | 2007 |
| January | 23 | 2004 | March | 27 | 2005 | February | 09 | 2007 |
| February | 02 | 2004 | April | 08 | 2005 | February | 10 | 2007 |
| February | 03 | 2004 | April | 27 | 2005 | February | 12 | 2007 |
| February | 15 | 2004 | May | 07 | 2005 | February | 22 | 2007 |
| February | 16 | 2004 | May | 08 | 2005 | February | 25 | 2007 |
| February | 17 | 2004 | November | 28 | 2005 | February | 26 | 2007 |
| February | 18 | 2004 | November | 30 | 2005 | February | 27 | 2007 |
| February | 21 | 2004 | December | 17 | 2005 | April | 14 | 2007 |
| February | 24 | 2004 | December | 18 | 2005 | April | 21 | 2007 |
| February | 25 | 2004 | December | 20 | 2005 | April | 22 | 2007 |

Notice of Violations and Intent to File Suit