# EXHIBIT 1

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF CLAIMS

This Settlement Agreement and Mutual Release of Claims ("AGREEMENT") is entered into between the California Sportfishing Protection Alliance ("CSPA") and Contra Costa Waste Service Recycling Center and Transfer Station ("CCWS") (collectively, the "SETTLING PARTIES") with respect to the following facts and objectives:

## RECITALS

**WHEREAS**, CSPA is a 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California, dedicated to the protection, enhancement, and restoration of the San Francisco Bay, Suisun Bay, and other California waters;

**WHEREAS**, CCWS is a corporation organized under the laws of the State of California that owns and operates a recycling center and transfer station at 1300 Loveridge Road, Pittsburg, California (the "Facility") pursuant to State Water Resources Control Board Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System General Permit No. CAS000001, Waste Discharge Requirements for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities (hereinafter, the "General Permit"). A map of the Facility is attached hereto as Exhibit A and incorporated by reference;

**WHEREAS**, on May 18, 2007, CSPA provided CCWS a Notice of Violation and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act (the "Act" or "Clean Water Act"), 33 U.S.C. § 1365;

**WHEREAS**, on August 29, 2007, CSPA filed its Complaint in the United States District Court for the Northern District of California against CCWS (*California Sportfishing Protection Alliance v. Contra Costa Waste Service Recycling Center and Transfer Station,* Case No. 3:07-cv-04484-BZ). A true and correct copy of the Complaint, including the 60-Day Notice Letter, is attached hereto as Exhibit B and incorporated by reference;

**WHEREAS**, CCWS denies any and all of CSPA's claims in its 60-Day Notice Letter and Complaint;

1

**WHEREAS**, CSPA and CCWS, through their authorized representatives and without either adjudication of CSPA's claims or admission by CCWS of any alleged violation or other wrongdoing, have chosen to resolve in full CSPA's allegations in the 60-Day Notice Letter and Complaint through settlement and avoid the cost and uncertainties of further litigation; and

**WHEREAS**, CSPA and CCWS have agreed that it is in their mutual interest to enter into this AGREEMENT setting forth the terms and conditions appropriate to resolving CSPA's allegations set forth in the 60-Day Notice Letter and Complaint.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, CSPA and CCWS hereby agree as follows:

<u>**EFFECTIVE DATE**</u>

1.      The term "Effective Date," as used in this AGREEMENT, shall mean the last date on which the signature of a party to this AGREEMENT is executed.

<u>**COMMITMENTS OF CSPA**</u>

2.      **Stipulation to Dismiss and [Proposed] Order.**  Within ten (10) calendar days of the expiration of the Agencies' review period specified in Paragraph 18 below, CSPA shall file a Stipulation to Dismiss and [Proposed] Order thereon pursuant to Federal Rule of Civil Procedure 41(a)(2) with the United States District Court for the Northern District of California ("District Court"), with this AGREEMENT attached and incorporated by reference, specifying that CSPA is dismissing all claims in CSPA's Complaint.  Consistent with Paragraphs 12, 25 and 26 herein, the Stipulation to Dismiss and [Proposed] Order shall state that the District Court will maintain jurisdiction through December 15, 2010 for purposes of resolving any disputes between the SETTLING PARTIES with respect to any provision of this AGREEMENT.  If the District Court chooses not to enter the Order, this AGREEMENT shall be null and void.

<u>**COMMITMENTS OF CCWS**</u>

3.      **Compliance with General Permit.**  CCWS agrees to operate the Facility in compliance with the applicable requirements of the General Permit and Clean Water Act.

4.    **MITIGATION PAYMENT**.  In recognition of the good-faith efforts by CCWS to comply with all aspects of the General Permit and the Clean Water Act, and in lieu of payment by CCWS of any penalties, which may have been assessed in this action if it had proceeded to trial, CCWS agrees to pay the sum of thirty five thousand dollars ($35,000.00) to the Rose Foundation for Communities and the Environment ("Rose Foundation") for the sole purpose of providing grants to environmentally beneficial projects within the San Francisco Bay-Delta Estuary, relating to water quality improvements in the area.  Payment shall be made by CCWS within fifteen (15) calendar days of the District Court's entry of the Order described in Paragraph 2 of this AGREEMENT.  Payment by CCWS shall be made in the form of a single check payable to the "Rose Foundation."

5.    **Implemented Storm Water Controls**.  CCWS shall maintain in good working order all storm water collection and treatment systems currently installed or to be installed pursuant to this AGREEMENT, including, but not limited to, existing housekeeping measures.

6.    **Additional Protection of Drains.**  CCWS shall take the following actions to improve the storm water pollution prevention measures at the drop inlets and outfall at the Facility.

a.    By December 1, 2007, CCWS shall construct and install a broad, shallow swale filled with woodchips immediately upgradient from the drop inlet located in the Northern unpaved area of the Facility.  The swale shall be appropriately sized to handle storm events of up to 25 year, 24-hour storm event in size and to maximize the settling out of solids from storm water passing through the swale.  The woodchip filters shall be secured with an appropriately sized mesh screen to prevent dislodging of woodchips during storm events.  CCWS shall construct a depressed collection area filled with gravel and cobbles immediately in front of the drop inlet designed to reduce TSS levels in storm water flowing through that area.

    b.    By December 1, 2007, CCWS shall install filters on all fourteen ("14") drop inlets. CCWS shall use 24" by 24" FloGard+ filters manufactured by Kristar Enterprises. Each filter shall be replaced or maintained as needed.

    c.    By December 1, 2007, CCWS shall secure the straw waddle surrounding the drop inlet in the northwestern part of the Facility. The method of securing the waddle shall be maintained as needed to ensure that the straw waddle remains in place.

    d.    By December 1, 2007, CCWS shall regrade the southwestern and southeastern yards of the Facility, including the southeast corner adjacent to the entrance, to achieve a positive flow of storm water towards the swale and catchment described in paragraph 6.a in the Northern unpaved area of the Facility. The regrading shall be implemented to create an effective berm preventing any storm water from flowing off of the southern portion of the Facility.

    e.    By June 1, 2008, CCWS shall design and install removable metal covers for all drop inlets at the Facility. The covers shall be placed over all drop inlets on June 1 at the end of each rainy season, subsequent to appropriate cleaning of the filters described above. The covers shall be removed prior to the first rain event of the subsequent rainy season. The covers shall be fitted to ensure that no materials may enter the drop inlets and designed such that the covers will remain firmly in place while there is normal activity at the Facility.

7.    **Increased Housekeeping Measures.** CCWS shall institute the following accelerated pavement cleaning schedule at the facility:

    a.    On each day that it is open and staffed, CCWS shall conduct daily, year-round, manual sweepings of key material transfer areas and of areas with significant visible accumulation of sediment or debris.

b.     On each day that it is opened and staffed, CCWS shall conduct daily, mechanical sweeping of the entire Facility with a Tenet sweeper for no less than sixteen ("16") hours per day.

c.     All sweeping activities performed at the Facility shall be recorded in a sweeping log and a sample blank log form will be included in the Facility's Annual Report and the Storm Water Pollution Prevention Plan.

d.     During the rainy season, CCWS shall monitor the clarifiers on a weekly basis.  During the rainy season, the clarifiers shall be cleaned out as necessary to ensure their proper operation, but in no case shall they be cleaned less than monthly.  During the dry season, the clarifiers will be cleaned out as necessary to ensure their proper operation, but in no case shall they be cleaned less than quarterly.

8.     **Monitoring**.  CCWS agrees to perform the monitoring described herein during the 2007-2008, 2008-2009, and 2009-2010 rainy seasons in addition to the minimum monitoring requirements of the General Permit.

a.     CCWS shall sample and analyze storm water discharges from all storm water discharge locations during four storm events that result in discharge consistent with the requirements and protocols set forth in the General Permit.  In the event there are exceedences during any one or more of the four sampling events, to determine the source of any exceedances, CCWS shall also sample and analyze water samples from each of the three ("3) clarifiers for four storm events.  CCWS shall analyze each sample for total suspended solids, pH, oil and grease, electrical conductivity, and total organic carbon.

b.     For each significant rain event occurring during the 2007-2008, 2008-2009, or 2009-2010 rainy seasons that results in any discharge from the Facility during regularly scheduled operating hours, CCWS shall conduct visual observations of all known and suspected storm water discharge

5

locations, including the entire perimeter of the Facility. CCWS shall maintain a log describing all observations of conditions relating to the management of storm water at the Facility.

c.      During each of its monthly wet weather storm inspections required by the General Permit, CCWS shall take representative photographs of discharges from the Facility's entrance, main outfall, any other location where storm water is being released, and the swale and catchment basin in the Northern unpaved area of the Facility.

d.      During each of its monthly wet weather storm inspections required by the General Permit, CCWS shall make visual observations of all filters installed in the drop inlets. CCWS shall replace any filters as needed.

e.      All maintenance, repair, and replacement activities relating to the Facility's storm water management program shall be recorded and described on appropriate log books or sheets. Such logs shall include, but not be limited to, information showing the date, time, place, person responsible and a brief description of all repairs, replacements, or maintenance, and include photographs. Sample logsheets shall be included in the Facility's SWPPP. Completed logs for each rainy season shall be included as part of the Facility's Annual Report submitted to the Regional Water Quality Control Board ("Regional Board").

f.      CCWS shall implement a program for monitoring and cleaning up oil and grease that may be deposited on the site from the trucks that regularly enter the premises. CCSW will conduct daily visual monitoring of areas where trucks and other vehicles travel within the Facility. Any spills observed will be immediately cleaned and treated. A description of all oil and grease monitoring and cleaning performed at the Facility shall be recorded in an oil monitoring log and a sample blank log form will be

6

included in the Facility's Annual Report and the Storm Water Pollution Prevention Plan.

g.    All photographs required by this Settlement Agreement shall be in color and electronically formatted. Each photograph shall be identified by date, the person taking the photograph and the location of the Facility being photographed. The title of each electronic photograph shall include, at a minimum, the date it was taken, the initials of the person taking the photograph and an abbreviation identifying the location of the photographed area. Any photograph required by this Settlement Agreement shall be provided to CSPA upon request via compact disc(s), or electronically via e-mail.

9.    **Monitoring Results.** Results from CCWS's sampling and analysis during the term of this AGREEMENT shall be provided to CSPA within 30 days of receipt of the sampling results by CCWS or its counsel.

10.    **Meet and Confer Regarding Exceedence of Levels of Potential Concern.** If analytical results of storm water samples taken by CCWS during the 2007-2008, 2008-2009 and/or the 2009-2010 rainy season indicate that storm water discharges from the Facility exceed the following Levels of Concern –  Total Suspended Solids: 100 mg/L; Specific Conductance: 200 µmhos/cm;  Oil & Grease: 15 mg/L;  pH: 6.0-9.0 s.u.; or Total Organic Carbon: 110 mg/L – CCWS agrees to take additional feasible measures aimed at reducing pollutants in the Facility's storm water to levels at or below these Levels.

In furtherance of that objective, CCWS shall prepare a written statement ("Memorandum") discussing:

(1)    any exceedence or exceedences;

(2)    an explanation of the possible cause(s) and/or source(s) of any exceedence; and

(3)    additional feasible Best Management Practices ("BMP") that will be taken to further reduce the possibility of future exceedance(s).

7

Such Memorandum shall be e-mailed and sent via first class mail to CSPA not later than July 1st following the conclusion of each rainy season.

11.     Any additional measures set forth in the Memorandum shall be implemented as soon as practicable, but not later than 21 days from the due date of the Memorandum, except where 1) structural changes require longer than 21 days to complete 2) weather-related conditions render immediate implementation infeasible; or 3) the SETTLING PARTIES agree in writing to defer implementation of specific measures in order to effectively meet and confer in accordance with paragraph 12.  Within thirty (30) days of implementation, CCWS' SWPPP shall be amended to include all additional BMP measures implemented pursuant to the Memorandum.

12.     Upon receipt of the Memorandum, CSPA may review and comment on any additional measures.  If requested by CSPA within 21 days of receipt of such Memorandum, CSPA and CCWS shall meet and confer and conduct a site inspection within 60-days after the due date of the Memorandum to discuss the contents of the Memorandum and the adequacy of proposed measures to improve the quality of the Facility's storm water to levels at or below the Levels of Concern.  If within 21-days of the parties meeting and conferring, the parties do not agree on the adequacy of the additional measures set forth in the Memorandum, the SETTLING PARTIES may agree to seek a settlement conference with the Magistrate Judge or Judge assigned to this action pursuant to Paragraphs 25 and 26 below.  If the SETTLING PARTIES fail to reach agreement on additional measures, CSPA may bring a motion consistent with Paragraphs 25 and 26 below.

13.     Any concurrence or failure to object by CSPA with regard to the reasonableness of any additional measures implemented by CCWS shall not be deemed to be an admission of the adequacy of such measures should they fail to bring the Facility's storm water into compliance with applicable water quality criteria or any Level of Concern.

14.     In addition to any site inspections conducted as part of meeting and conferring on additional measures set forth above, CCWS shall permit representatives of CSPA to perform one (1) additional site visit per rainy season to the Facility during normal daylight business hours

during the term of this AGREEMENT; provided that CSPA provides CCWS via e-mail with at least two-days prior written notice.

15.      **Provision of Documents and Reports.**  During the life of this AGREEMENT, CCWS shall provide CSPA with a copy of all documents submitted to the Regional Board or the State Water Resources Control Board ("State Board") concerning the Facility's storm water discharges, including but not limited to all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit.  Such documents and reports shall be mailed to CSPA contemporaneously with submission to such agency.  CCWS also shall provide CSPA a copy of all documents referenced in this agreement, including but not limited to logs, photographs, or analyses, within 7 days of a written request (via e-mail or regular mail) by CSPA.

16.      **Amendment of SWPPP.**  Within sixty (60) days of the Effective Date of this AGREEMENT, CCWS shall amend the Facility's Storm Water Pollution Prevention Plan ("SWPPP") to incorporate all changes, improvements, sample log forms, and best management practices set forth in or resulting from this AGREEMENT.  A copy of the amended SWPPP shall be provided to CSPA within thirty (30) days of completion.

17.      **Fees, Costs, and Expenses**.  As reimbursement for CSPA's investigative, expert and attorneys' fees and costs, CCWS shall pay CSPA the sum of twenty-six thousand dollars ($26,000.00).  Payment shall be made by CCWS within fifteen (15) calendar days of the District Court's entry of the Order dismissing the action described in Paragraph 2 of this AGREEMENT. Payment by CCWS to CSPA shall be made in the form of a single check payable to "Law Office of Michael R. Lozeau Attorney Client Trust Account," and shall constitute full payment for all costs of litigation, including investigative, expert and attorneys' fees and costs incurred by CSPA that have or could have been claimed in connection with CSPA's claims, up to and including the Effective Date of this AGREEMENT.

18.      **Compliance Oversight Costs**:  As reimbursement for CSPA's future costs that will be incurred in order for CSPA to monitor CCWS' compliance with this AGREEMENT and to effectively meet and confer and evaluate monitoring results for the Facility, CCWS agrees to

reimburse CSPA for costs incurred in overseeing the implementation of this AGREEMENT up to but not exceeding five thousand dollars ($5,000.00) per rainy season. Costs reimbursable pursuant to this paragraph may include, but are not limited to, costs by CSPA or its counsel to conduct site inspections, review of water quality sampling reports, review of annual reports, discussion with representatives of CCWS concerning potential changes to compliance requirements, preparation and participation in meet and confer sessions and mediation, and water quality sampling. Up to three annual payments (one addressing any monitoring associated with the 2007-2008 rainy season, one addressing monitoring associated with the 2008-2009 rainy season, and one addressing monitoring associated with the 2009-2010 rainy season ) shall be made payable to Michael R. Lozeau Attorney-Client Trust Account within thirty (30) days of receipt of an invoice from CSPA which contains a description of fees and costs incurred by CSPA to monitor implementation of the SETTLEMENT AGREEMENT during the previous twelve (12) months.

19. **Review by Federal Agencies.** CSPA shall submit this AGREEMENT to the U.S. EPA and the U.S. Department of Justice (hereinafter, the "Agencies") via certified mail, return receipt requested, within five  (5) days after the Effective Date of this AGREEMENT for review consistent with 40 C.F.R. § 135.5. The Agencies' review period expires forty-five (45) days after receipt of the AGREEMENT by both Agencies, as evidenced by the return receipts, copies of which shall be provided to CCWS upon receipt by CSPA. In the event that the Agencies comment negatively on the provisions of this AGREEMENT, CSPA and CCWS agree to meet and confer to attempt to resolve the issue(s) raised by the Agencies. If CSPA and CCWS are unable to resolve any issue(s) raised by the Agencies in their comments, CSPA and CCWS agree to expeditiously seek a settlement conference with the Magistrate Judge assigned to the Complaint in this matter to resolve the issue(s).

## <u>NO ADMISSION OR FINDING</u>

20. Neither this AGREEMENT nor any payment pursuant to the AGREEMENT shall constitute evidence or be construed as a finding, adjudication, or acknowledgment of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule or

regulation.  However, this AGREEMENT and/or any payment pursuant to the AGREEMENT may constitute evidence in actions seeking compliance with this AGREEMENT.

## MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

21.    In consideration of the above, and except as otherwise provided by this AGREEMENT, the SETTLING PARTIES hereby forever and fully release each other and their respective successors, assigns, officers, agents, employees, and all persons, firms and corporations having an interest in them, from any and all claims and demands of any kind, nature, or description whatsoever, and from any and all liabilities, damages, injuries, actions or causes of action, either at law or in equity, which the SETTLING PARTIES have against each other arising from CSPA's allegations and claims set forth in the 60-Day Notice Letter and Complaint up to and including the Termination Date of this AGREEMENT.

22.    The SETTLING PARTIES acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The SETTLING PARTIES hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from, or related to, the allegations and claims as set forth in the 60-Day Notice Letter and Complaint up to and including the Termination Date of this AGREEMENT.

23.    For the period beginning on the Effective Date and ending on December 15, 2010, CSPA agrees that neither CSPA, its officers, executive staff, members of its governing board nor any organization under the control of CSPA, its officers, executive staff, or members of its governing board, will file any lawsuit against CCWS seeking relief for alleged violations of the Clean Water Act or violations of the General Permit.  CSPA further agrees that, beginning on the Effective Date and ending on December 15, 2010, CSPA will not support other lawsuits, by providing financial assistance, personnel time or other affirmative actions, against CCWS that

may be proposed by other groups or individuals who would rely upon the citizen suit provision of the Clean Water Act to challenge CCWS's compliance with the Clean Water Act or the General Permit.

## **TERMINATION DATE OF AGREEMENT**

24.     This AGREEMENT shall terminate on December 15, 2010.

## **DISPUTE RESOLUTION PROCEDURES**

25.     Except as specifically noted herein, any disputes with respect to any of the provisions of this AGREEMENT or in any 21-Day Memorandum delivered pursuant to Paragraphs 10-12 herein, ("Disputed Issue") shall be resolved through the following procedure. The SETTLING PARTIES agree to first meet and confer to resolve any Disputed Issue arising under this AGREEMENT.  In the event that such Disputed Issue cannot be resolved through this meet and confer process, the SETTLING PARTIES agree to request a settlement meeting before the Magistrate Judge assigned to this action.  In the event that the SETTLING PARTIES cannot resolve the Disputed Issue by the conclusion of the settlement meeting with the Magistrate Judge, the SETTLING PARTIES agree to submit the Disputed Issue via motion to the Judge assigned to this action.  The SETTLING PARTIES may also agree to submit the motion to the Magistrate Judge.

26.     In resolving any dispute arising from this AGREEMENT, the Magistrate Judge and/or Judge shall have discretion to award attorneys' fees and costs to either party.  The relevant provisions of the then-applicable Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of fees and costs in connection with the resolution of any Disputed Issues.  The SETTLING PARTIES expressly acknowledge and agree that the Magistrate's and Judge's discretion in awarding attorney's fees shall consider the reasonableness and good faith of the SETTLING PARTIES with respect to any Disputed Issue. The SETTLING PARTIES agree to file any waivers necessary for the Magistrate Judge to preside over any settlement conference.

## **BREACH OF SETTLEMENT AGREEMENT**

27.     **Impossibility of Performance.**  Where implementation of the actions set forth in this AGREEMENT, within the deadlines set forth in those paragraphs, becomes impossible, despite the timely good faith efforts of the SETTLING PARTIES, the party who is unable to comply shall notify the other in writing within seven (7) days of the date that the failure becomes apparent, and shall describe the reason for the non-performance.  The SETTLING PARTIES agree to meet and confer in good faith concerning the non-performance and, where the SETTLING PARTIES concur that the non-performance was or is impossible, despite the timely good faith efforts of one of the SETTLING PARTIES, new performance deadlines shall be established.  In the event that the SETTLING PARTIES cannot timely agree upon the terms of such a stipulation, either of the SETTLING PARTIES shall have the right to invoke the dispute resolution procedure described herein.

## **GENERAL PROVISIONS**

28.     **Construction.**  The language in all parts of this AGREEMENT shall be construed according to its plain and ordinary meaning, except as to those terms defined by law, in the General Permit, Clean Water Act or specifically herein.

29.     **Interpretation.**  This AGREEMENT was jointly drafted by the SETTLING PARTIES, by and through their attorneys of record.  The SETTLING PARTIES agree that they have each consulted their respective attorneys and clearly understand the terms herein. Accordingly, and based on said joint drafting of this AGREEMENT, this AGREEMENT shall not be interpreted or construed against any party on the grounds that said party is the drafting party.

30.     **Choice of Law.** This AGREEMENT shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

31.     **Severability.**  In the event that any provision, section, or sentence of this AGREEMENT is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

32.    **Correspondence.**  All notices required herein or any other correspondence pertaining to this AGREEMENT shall be sent by regular, certified, or overnight mail as follows:

<u>If to CSPA</u>:

Bill Jennings, Chairman
California Sportfishing Protection Alliance
3536 Rainier Road
Stockton, CA  95204
Tel: (209) 464-5067
deltakeep@aol.com

And to:

Michael R. Lozeau
Douglas J. Chermak
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel:  (510) 749-9102
mrlozeau@lozeaulaw.com
djchermak@lozeaulaw.com

<u>If to CCWS</u>:

Silvio Garaventa, Jr.
Contra Costa Waste Service
P.O.Box 5397
Concord, CA 94520
Tel: (925) 682-7492
Sil@GaraventaEnt.com

And to:

Fred Blum
Joseph B. Adams
Bassi, Martini, Edlin & Blum
351 California Street, Suite 200
San Francisco, CA  94104
415-403-4404
fblum@bmeblaw.com
jadams@bmeblaw.com

Notifications of communications shall be deemed submitted on the date that they are e-mailed, postmarked and sent by first-class mail or deposited with an overnight mail/delivery service. Any change of address or addresses shall be communicated in the manner described above for giving notices.

33. **Counterparts.** This AGREEMENT may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopied, scanned (.pdf), and/or facsimiled copies of original signature shall be deemed to be originally executed counterparts of this AGREEMENT.

34. **Assignment**. Subject only to the express restrictions contained in this AGREEMENT, all of the rights, duties and obligations contained in this AGREEMENT shall inure to the benefit of and be binding upon the SETTLING PARTIES, and their successors and assigns.

35. **Modification of the Agreement:** This AGREEMENT, and any provisions herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed by the SETTLING PARTIES.

36. **Full Settlement.** This AGREEMENT constitutes a full and final settlement of this matter. It is expressly understood and agreed that the AGREEMENT has been freely and voluntarily entered into by the SETTLING PARTIES with and upon advice of counsel.

37. **Integration Clause.** This is an integrated AGREEMENT. This AGREEMENT is intended to be a full and complete statement of the terms of the agreement between the SETTLING PARTIES and expressly supersedes any and all prior oral or written agreements covenants, representations and warranties (express or implied) concerning the subject matter of this AGREEMENT.

38. **Authority.** The undersigned representatives for CSPA and CCWS each certify that he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of this AGREEMENT.

The SETTLING PARTIES hereby enter into this AGREEMENT.

Date: 12/20/, 2007

Contra Costa Waste Service Recycling Center &
Transfer Station

By: Silvio Garaventa, Jr
Title: Owner

Date: 14 December 2007

CALIFORNIA SPORTFISHING PROTECTION
ALLIANCE

By: Bill Jennings
Title: Executive Director

APPROVED AS TO FORM:

Date: 12/21, 2007

For DEFENDANT

BASSI, MARTINI, EDLIN & BLUM

By:   Joseph B. Adams, Esq.

Date: December 14, 2007

For PLAINTIFF

LAW OFFICE OF MICHAEL LOZEAU

By:   Douglas J. Chermak, Esq.

16



KEY & NOTES

| | PAVEMENT |
| | WOOD CHIPS |
| | EARTHEN BERM |
| | SITE BOUNDARY |
| | OUTLINE OF PAVED AREAS |
| | BUILDING OUTLINE |
| | DRAINAGE SWALE |
| | FLOW DIRECTION |

EXISTING CATCH BASIN WITH FLOGARD INLET FILTER
EXISTING MANHOLE
EXISTING DOWN SPOUT
EXISTING CLEAN OUT
EXISTING ROOF DRAIN PIPE (APPROXIMATE)
EXISTING FIRE HYDRANT
EXISTING TRENCH DRAIN
EXISTING STORM DRAIN PIPE
EXISTING SANITARY SEWER PIPE
STORM WATER INTERCEPTOR

STORM WATER PUMP STATION (1100 GPM)
750 GALLON STORMWATER INTERCEPTOR
1500 GALLON STORMWATER INTERCEPTOR
2000 GALLON STORMWATER INTERCEPTOR
6' x 6' CONCRETE SPILLWAY
5' x 5' ROCK RIP RAP
22 GALLON SUBMERSIBLE PUMP
SANITARY SEWER PUMP STATION (75 GPM)
PIT WASTE WATER PUMP (100 GPM)
2- 5400 GAL HOLDING TANKS
8,000 GAL DIESEL STORAGE TANK AND 1,000 GAL GASOLINE STORAGE TANK WITH SECONDARY CONTAINMENT

LANDS OF USS POSCO

073-200-21

EXISTING DRAINAGE DITCH

UNPAVED GREEN WASTE WOOD CHIP AREA

073-200-13

WOOD CHIP TREATMENT SWALE
STABILIZED ROCK INLET
SCALE HOUSE
OFF-SITE DISCHARGE POINT WATER SAMPLING LOCATION

UNPAVED STORAGE AREA

LANDS LEASED TO OTHERS

EARTHEN BERM TO PREVENT OFFSITE FLOW OF RUNOFF

EQUIPMENT AND VEHICLE FUELING AREA

FUTURE RECYCLING CENTER

MAIN WASTE TRANSFER / TIPPING BUILDING

VEHICLE PARKING

SANITARY SEWER TANK

TRUCK LOADING RAMP

TRENCH DRAIN WITH FLOGARD INLET FILTER

PIT WATER STORAGE TANKS

ATCHISON TOPEKA SANTA FE RAILROAD

LOVERIDGE ROAD

CARLSON, BARBEE & GIBSON NOTE:
ALL UTILITY INFORMATION SHOWN IS PER THE RECYCLING CENTER & TRANSFER STATION BUILDING REMODEL CONSTRUCTION PLANS PREPARED BY ROGER J. WILSON ARCHITECT, DATED JULY 11TH, 1995.

NOTE: Base Map Provided by Carlson, Barbee & Gibson, Inc. Draft Utility Exhibit, Undated.

SCALE: 1" = 60'
0    60    120

| | | |
|---|---|---|
| DATE: | 12-10-07 | |
| DESIGN: | N.K. | |
| DRAWN: | V.G. | |
| APPROVED: | N.K. | |
| JOB NO: | 346-4SW | |

| REV. NO. | DATE | DESCRIPTION | BY |
|---|---|---|---|

Stevens Ferrone & Bailey Engineering Company, Inc

1470 Enea Circle #1551
Concord, CA 94520
Tel 925.688.1001
Fax 925.688.1005
www.SFandB.com

SITE DRAINAGE PLAN

CONTRA COSTA WASTE SERVICE RECYCLING CENTER AND TRANSFER STATION
1300 LOVERIDGE ROAD
Pittsburg, California

SHEET
2



FILED

1   MICHAEL R. LOZEAU (State Bar No. 142893)
2   DOUGLAS J. CHERMAK (State Bar No. 233382)
    Law Office of Michael R. Lozeau
3   1516 Oak Street, Suite 216
    Alameda, CA 94501
4   Tel: (510) 749-9102
    Fax: (510) 749-9103 (fax)
5   E-mail: mrlozeau@lozeaulaw.com

6   ANDREW L. PACKARD (State Bar No. 168690)
    MICHAEL P. LYNES (State Bar No. 230462)
7   Law Offices of Andrew L. Packard
    319 Pleasant Street
8   Petaluma, CA 94952
    Tel: (707) 763-7227
9   Fax: (415) 763-9227
    E-mail: andrew@packardlawoffices.com **E-filing**
10
    Attorneys for Plaintiff
11  CALIFORNIA SPORTFISHING
    PROTECTION ALLIANCE
12

13              **UNITED STATES DISTRICT COURT**

14            **NORTHERN DISTRICT OF CALIFORNIA**

15  CALIFORNIA SPORTFISHING          Case No. _____   B Z
    PROTECTION ALLIANCE, a non-profit
    corporation,
                                     **COMPLAINT FOR DECLARATORY**
        Plaintiff,                   **AND INJUNCTIVE RELIEF AND**
                                     **CIVIL PENALTIES**
        vs.
                                                                  A D R
    CONTRA COSTA WASTE SERVICE       (Federal Water Pollution Control Act,
    RECYCLING CENTER AND             33 U.S.C. §§ 1251 to 1387)
    TRANSFER STATION, a corporation.

        Defendant.

    CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its

    counsel, hereby alleges:

25  **I.    INTRODUCTION**

26      1.    This complaint seeks relief for Defendant's discharges of polluted storm water

27  and non-storm water pollutants from Defendant's facility ("the Facility") into the waters of

28  the United States in violation of the Act and the State of California's "Waste Discharge

    COMPLAINT
                                      1

GO 44 SEC. N
NOTICE OF ASSIGNMENT
TO MAGISTRATE JUDGE SENT

**1** Requirements (WDRs) For Discharges of Storm Water Associated With Industrial Activities

**2** Excluding Construction Activities," State Water Resources Control Board ("State Board")

**3** Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ

**4** and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System

**5** ("NPDES") Permit No. CAS000001, (hereinafter "the Order" or "Permit"). Defendant's

**6** violations of the discharge, treatment technology, monitoring requirements, and other

**7** procedural and substantive requirements of the Permit and the Act are ongoing and

**8** continuous.

**9** 2. The failure on the part of persons and facilities such as Defendant and its

**10** industrial facility to comply with storm water requirements is recognized as a significant

**11** cause of the continuing decline in water quality of the Suisun Bay, San Francisco Bay

**12** ("Bay"), and other area receiving waters. The general consensus among regulatory agencies

**13** and water quality specialists is that storm pollution amounts to a substantial portion of the

**14** total pollution entering the aquatic environment each year. With every rainfall event,

**15** millions of gallons of polluted rainwater originating from industries within the surrounding

**16** area pour into the Bay.

**17** 3. The continuing decline in water quality in the San Francisco Bay is a matter of

**18** serious public concern. Data gathered by CalFed, a coalition of fifteen state and federal

**19** agencies analyzing water allocation issues, has confirmed that the Bay is a heavily polluted

**20** water body. The entire Bay and all of its major tributaries have been identified by the State

**21** Board, the Regional Board, and EPA as impaired water bodies under Section 303(d) of the

**22** Clean Water Act. 33 U.S.C. § 1313(d).

**23** **II.   JURISDICTION AND VENUE**

**24** 4. This is a civil suit brought under the citizen suit enforcement provisions of the

**25** Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or

**26** "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter

**27** of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28

**28** U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is

COMPLAINT

2

**1** authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of

**2** actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§

**3** 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

**4**     5.     On or about May 18, 2007, Plaintiff provided notice of Defendant's violations

**5** of the Act, and of its intention to file suit against Defendant, to the Defendant; the

**6** Administrator of the United States Environmental Protection Agency ("EPA"); the

**7** Administrator of EPA Region IX; the Executive Director of the State Water Resources

**8** Control Board ("State Board"); and to the Executive Officer of the Regional Water Quality

**9** Control Board, San Francisco Bay Region ("Regional Board"). A true and correct copy of

**10** CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

**11**     6.     More than sixty days have passed since notice was served on Defendant and

**12** the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that

**13** neither the EPA nor the State of California has commenced or is diligently prosecuting a

**14** court action to redress the violations alleged in this complaint. This action's claim for civil

**15** penalties is not barred by any prior administrative penalty under Section 309(g) of the Act,

**16** 33 U.S.C. § 1319(g).

**17**     7.     Venue is proper in the Northern District of California pursuant to Section

**18** 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located

**19** within this judicial district. Pursuant to Local Rule 3-2(c), intradistrict venue is proper in

**20** Oakland, California because the sources of the violations are located within Contra Costa

**21** County, California.

**22** **III.**    **PARTIES**

**23**     8.     Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

**24** ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of

**25** California with its main office in Stockton, California. CSPA has approximately 2,000

**26** members who live, recreate and work in and around waters of the State of California,

**27** including Suisun Bay and San Francisco Bay. CSPA is dedicated to the preservation,

**28** protection, and defense of the environment, the wildlife and the natural resources of all

COMPLAINT
3

1  waters of California. To further these goals, CSPA actively seeks federal and state agency

2  implementation of the Act and other laws and, where necessary, directly initiates

3  enforcement actions on behalf of itself and its members.

4       9.     Members of CSPA reside in and around the Bay and enjoy using the Bay for

5  recreation and other activities. Members of CSPA use and enjoy the waters into which

6  Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.

7  Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife

8  and engage in scientific study including monitoring activities, among other things.

9  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to

10 such threats and impairments. Thus, the interests of CSPA's members have been, are being,

11 and will continue to be adversely affected by Defendant's failure to comply with the Clean

12 Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused

13 by Defendant's activities.

14      10.    Plaintiff is informed and believes, and thereupon alleges, that Defendant

15 CONTRA COSTA WASTE SERVICE RECYCLING CENTER AND TRANSFER

16 STATION (hereinafter "Defendant" or "Recycling Center") is a corporation organized under

17 the laws of California. Defendant Recycling Center operates a recycling center and transfer

18 station in Pittsburg, California.

19 **IV.    STATUTORY BACKGROUND**

20      11.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

21 pollutant into waters of the United States, unless such discharge is in compliance with

22 various enumerated sections of the Act. Among other things, Section 301(a) prohibits

23 discharges not authorized by, or in violation of, the terms of an NPDES permit issued

24 pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

25      12.    Section 402(p) of the Act establishes a framework for regulating municipal and

26 industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States

27 with approved NPDES permit programs are authorized by Section 402(p) to regulate

28 industrial storm water discharges through individual permits issued to dischargers or through

COMPLAINT

4

**1** the issuance of a single, statewide general permit applicable to all industrial storm water

**2** dischargers. 33 U.S.C. § 1342(p).

**3**     13. Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

**4** U.S. EPA has authorized California's State Board to issue NPDES permits including general

**5** NPDES permits in California.

**6**     14. The State Board elected to issue a statewide general permit for industrial storm

**7** water discharges. The State Board issued the General Permit on or about November 19,

**8** 1991, modified the General Permit on or about September 17, 1992, and reissued the

**9** General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water

**10** Act, 33 U.S.C. § 1342(p).

**11**     15. In order to discharge storm water lawfully in California, industrial dischargers

**12** must comply with the terms of the General Permit or have obtained and complied with an

**13** individual NPDES permit. 33 U.S.C. § 1311(a).

**14**     16. The General Permit contains several prohibitions. Effluent Limitation B(3) of

**15** the General Permit requires dischargers to reduce or prevent pollutants in their storm water

**16** discharges through implementation of the Best Available Technology Economically

**17** Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional

**18** Pollutant Control Technology ("BCT") for conventional pollutants. BAT and BCT include

**19** both nonstructural and structural measures. General Permit, Section A(8). Discharge

**20** Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-

**21** storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

**22** Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to

**23** any surface or ground water that adversely impact human health or the environment.

**24** Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that

**25** cause or contribute to an exceedance of any applicable water quality standards contained in a

**26** Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

**27**     17. EPA has established Parameter Benchmark Values as guidelines for

**28** determining whether a facility discharging industrial storm water has implemented the

COMPLAINT

5

1    requisite BAT and BCT. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000). EPA has established

2    Parameter Benchmark Values for the following parameters, among others: total suspended

3    solids – 100 mg/L; pH – 6.0-9.0 s.u.; and oil/grease – 15 mg/L. The California State Water

4    Resources Control Board has proposed a Benchmark Value for electrical conductance of 200

5    μmhos/cm.

6        18.    In addition to absolute prohibitions, the General Permit contains a variety of

7    substantive and procedural requirements that dischargers must meet. Facilities discharging,

8    or having the potential to discharge, storm water associated with industrial activity that have

9    not obtained an individual NPDES permit must apply for coverage under the State's General

10   Permit by filing a Notice of Intent To Comply ("NOI"). The General Permit requires

11   existing dischargers to have filed their NOIs before March 30, 1992.

12       19.    Dischargers must develop and implement a Storm Water Pollution Prevention

13   Plan ("SWPPP"). The SWPP must describe storm water control equipment and measures

14   that comply with the BAT and BCT standards. The General Permit requires that an initial

15   SWPPP have been developed and implemented before October 1, 1992. The SWPPP must,

16   among other requirements, identify and evaluate sources of pollutants associated with

17   industrial activities that may affect the quality of storm and non-storm water discharges from

18   the facility and identify and implement site-specific best management practices ("BMPs") to

19   reduce or prevent pollutants associated with industrial activities in storm water and

20   authorized non-storm water discharges (Section A(2)). The SWPPP's BMPs must

21   implement BAT and BCT (Section B(3)). The SWPPP must include: a description of

22   individuals and their responsibilities for developing and implementing the SWPP (Section

23   A(3)); a site map showing the facility boundaries, storm water drainage areas with flow

24   pattern and nearby water bodies, the location of the storm water collection, conveyance and

25   discharge system, structural control measures, impervious areas, areas of actual and potential

26   pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials

27   handled and stored at the site (Section A(5)); a description of potential pollutant sources

28   including industrial processes, material handling and storage areas, dust and particulate

COMPLAINT

6

1   generating activities, and a description of significant spills and leaks, a list of all non-storm
2   water discharges and their sources, and a description of locations where soil erosion may
3   occur (Section A(6)). The SWPPP must include an assessment of potential pollutant sources
4   at the Facility and a description of the BMPs to be implemented at the Facility that will
5   reduce or prevent pollutants in storm water discharges and authorized non-storm water
6   discharges, including structural BMPs where non-structural BMPs are not effective (Section
7   A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where
8   necessary (Section A(9),(10)).

9       20.    Section C(11)(d) of the General Permit's Standard Provisions requires
10   dischargers to report any noncompliance to the Regional Board. *See also* Section E(6).
11   Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water
12   controls including the preparation of an evaluation report and implementation of any
13   additional measures in the SWPPP to respond to the monitoring results and other inspection
14   activities.

15       21.    The General Permit requires dischargers commencing industrial activities
16   before October 1, 1992 to develop and implement an adequate written monitoring and
17   reporting program no later than October 1, 1992. Existing facilities covered under the
18   General Permit had to implement all necessary revisions to their monitoring programs no
19   later than August 1, 1997.

20       22.    As part of their monitoring program, dischargers must identify all storm water
21   discharge locations that produce a significant storm water discharge, evaluate the
22   effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control
23   measures set out in the SWPPP are adequate and properly implemented. Dischargers must
24   conduct visual observations of these discharge locations for at least one storm per month
25   during the wet season (October through May) and record their findings in their Annual
26   Report. Dischargers must also collect and analyze storm water samples from at least two
27   storms per year. Section B(5)(a) of the General Permit requires that dischargers "shall
28   collect storm water samples during the first hour of discharge from (1) the first storm event

COMPLAINT

7

**1**  of the wet season, and (2) at least one other storm event in the wet season. All storm water

**2**  discharge locations shall be sampled." Section B(5)(c)(i)-(iii) requires dischargers to sample

**3**  and analyze during the wet season for basic parameters, such as pH, total suspended solids

**4**  ("TSS"), electrical conductance, and total organic content ("TOC") or oil and grease

**5**  ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants

**6**  likely to be in the storm water discharged from the facility. Dischargers must also conduct

**7**  dry season visual observations to identify sources of non-storm water pollution.

**8**    23. Section B(14) of the General Permit requires dischargers to submit an annual

**9**  report by July 1 of each year to the executive officer of the relevant Regional Board. The

**10**  annual report must be signed and certified by an appropriate corporate officer. Sections

**11**  B(14), C(9), (10). Section A(9)(d) of the General Permit requires the discharger to include

**12**  in their annual report an evaluation of their storm water controls, including certifying

**13**  compliance with the General Permit. *See also* Sections C(9) and (10) and B(14).

**14**    24. Section 505(a)(1) and Section 505(f) of the Act provide for citizen

**15**  enforcement actions against any "person," including individuals, corporations, or

**16**  partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f),

**17**  § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. §

**18**  1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to

**19**  $27,500 per day (violations from January 30, 1997 through March 15, 2004) and $32,500

**20**  per day (violations after March 15, 2004) pursuant to Sections 309(d) and 505 of the Act, 33

**21**  U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

**22**    25. The Regional Board has established water quality standards for the San

**23**  Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally

**24**  referred to as the Basin Plan.

**25**    26. The Basin Plan provides that "[w]aters shall not contain suspended material in

**26**  concentrations that cause nuisance or adversely affect beneficial uses" and that "[w]aters

**27**  shall not contain biostimulatory substances in concentrations that promote aquatic growths to

**28**  the extent that such growths cause nuisance or adversely affect beneficial uses."

COMPLAINT

8

**1**       27.    The Basin Plan dictates that "[w]aters shall be free of changes in turbidity that

**2** cause nuisance or adversely affect beneficial uses."

**3**       28.    The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes,

**4** or other materials in concentrations that result in a visible film or coating on the surface of

**5** the water or on objects in the water, that cause nuisance, or that otherwise adversely affect

**6** beneficial uses."

**7**       29.    The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor

**8** raised above 8.5."

**9** **V.    STATEMENT OF FACTS**

**10**       30.    Defendant Recycling Center operates a recycling center and transfer station at

**11** 1300 Loveridge Road in Pittsburg, California.  The Facility is engaged in storing,

**12** processing, and trucking various materials.  The Facility falls within the Standard Industrial

**13** Classification ("SIC") Code 4212.  The Facility covers about 11.7 acres, the majority of

**14** which is paved and used for storing and processing different types of metal, plastics,

**15** construction material, wood chips, and other materials, including large forklifts, trucks, and

**16** other vehicles.  On information and belief, Plaintiff alleges that there are several buildings

**17** located on the property.  On information and belief, Plaintiff alleges that recycling and

**18** processing is conducted both inside and outside of these buildings.  Materials are transported

**19** in and out of these buildings for storage in the paved and unpaved areas of the Facility.

**20**       31.    Defendant channels and collects storm water falling on the Facility though one

**21** storm water outfall.  Storm water discharged from the outfall enters a channel behind the

**22** facility.  The channel is a tributary to the Suisun Bay.

**23**       32.    The industrial activities at the site include the storage, processing, and transfer

**24** of a variety of materials including construction material and debris, hazardous material,

**25** metal, organic material, paper, plastic, and other materials.  It also includes the storage and

**26** maintenance of trucks used to transfer and dispose of these materials.

**27**       33.    Significant activities at the site take place outside and are exposed to rainfall.

**28** These activities include the storage and processing of the numerous types of materials

COMPLAINT

**1**  handled by the Facility; the storage and use of vehicles and equipment for materials

**2**  handling; and the storage, handling, and disposal of waste materials. Loading and delivery

**3**  of materials occurs both inside and outside. Trucks enter and exit the Facility directly from

**4**  and to a public road. Trucks are the primary means of moving materials around the unpaved

**5**  storage areas of the Facility. Plaintiff is informed and believes, and thereupon alleges, that

**6**  recycling and transfer activities also occur in exposed areas at the Facility. The Facility's

**7**  exposed areas contain large piles of a variety of materials. Plaintiff alleges on information

**8**  and belief that many of the exposed surfaces at the Facility are unpaved and sediment and

**9**  other materials are disturbed as a result of the recycling, storage, and transfer processes.

**10**  These areas are exposed to storm water and storm flows due to the lack of overhead

**11**  coverage, berms and other storm water controls.

**12**      34.    Industrial machinery, heavy equipment and vehicles, including trucks and

**13**  trailers are operated and stored at the Facility in areas exposed to storm water flows. Plaintiff

**14**  is informed and believes, and thereupon alleges, that such machinery and equipment leak

**15**  contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are exposed

**16**  to storm water flows.

**17**      35.    Plaintiff is informed and believes, and thereupon alleges that the storm water

**18**  flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease,

**19**  and other pollutants as it flows toward the storm water drain. Storm water and any

**20**  pollutants contained in that storm water entering the drain flows directly to the channel

**21**  behind the Facility.

**22**      36.    The management practices at the Facility are wholly inadequate to prevent the

**23**  sources of contamination described above from causing the discharge of pollutants to waters

**24**  of the United States. The Facility lacks sufficient structural controls such as grading,

**25**  berming, roofing, containment, or drainage structures to prevent rainfall and storm water

**26**  flows from coming into contact with these and other exposed sources of contaminants. The

**27**  Facility lacks sufficient structural controls to prevent the discharge of water once

**28**  contaminated. The Facility lacks adequate storm water pollution treatment technologies to

COMPLAINT

10

1    treat storm water once contaminated.

2    37.    Since at least December 13, 2002, Defendant has taken samples or arranged for
3    samples to be taken of storm water discharges at the Facility. The sample results were
4    reported in the Facility's annual reports submitted to the Regional Board. Defendant
5    Recycling Center certified each of those annual reports pursuant to Sections A and C of the
6    General Permit.

7    38.    Since at least December 13, 2002, the Facility has detected total suspended
8    solids, oil and grease, excess pH, and electrical conductance in storm water discharged from
9    the Facility. Levels of these pollutants detected in the Facility's storm water have been in
10   excess of EPA's numeric parameter benchmark values. Levels of these pollutants detected
11   in the Facility's storm water have been in excess of water quality standards established in the
12   Basin Plan.

13   39.    The levels of total suspended solids in storm water detected by the Facility
14   have exceeded the benchmark value for total suspended solids of 100 mg/L established by
15   EPA. For example, on January 7, 2005, the level of suspended solids measured by
16   Defendant in the Facility's discharged storm water was 16,500 mg/L. That level of total
17   suspended solids is 165 times the benchmark value for suspended solids established by EPA.

18   40.    The levels of oil and grease in storm water detected by the Facility have
19   exceeded the benchmark value for oil and grease of 15 mg/L established by EPA. For
20   example, on March 20, 2006, the level of oil and grease measured by Defendant in the
21   Facility's discharged storm water was 110 mg/L. That level of oil and grease is over seven
22   times the benchmark value for oil and grease established by EPA.

23   41.    The levels of pH in storm water detected by the Facility have exceeded the
24   benchmark value for pH of 6.0-9.0 s.u established by EPA. On January 7, 2005, the level of
25   pH measured by Defendant in the Facility's discharged storm water was 9.71 s.u.

26   42.    The electrical conductance levels detected by the Facility in its storm water
27   have been greater than the numeric water quality standards applicable to electrical
28   conductance in California. The electrical conductance levels detected by the Facility in its

COMPLAINT
11

1   storm water have been greater than the benchmark value of 200 µmho/cm proposed by the

2   State Board. For example, on March 20, 2006, the electrical conductance level measured by

3   Defendant in the Facility's discharged storm water was 821 µmho/cm. That electrical

4   conductance level is more than four times the State Board's proposed benchmark value.

5       43.    On information and belief, Plaintiff alleges that Defendants have failed to

6   conduct visual observations of storm water discharges from every discharge location at the

7   Facility at least once per month during each wet season since 2002-2003 in violation of

8   Section B(4) of the General Permit.

9       44.    On information and belief, Plaintiff alleges that since at least December 13,

10   2002, Defendant has failed to implement BAT and BCT at the Facility for its discharges of

11   suspended solids, pH, electrical conductance, oil and grease, and other pollutants. Section

12   B(3) of the General Permit requires that Defendant implement BAT for toxic and

13   nonconventional pollutants and BCT for conventional pollutants by no later than October 1,

14   1992. As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

15       45.    On information and belief, Plaintiff alleges that since at least October 1, 1992,

16   Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan

17   ("SWPPP") for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the

18   SWPPP prepared for the Facility does not set forth site-specific best management practices

19   for the Facility that are consistent with BAT or BCT for the Facility. Plaintiff is informed

20   and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not

21   include an assessment of potential pollutant sources, structural pollutant control measures

22   employed by the Defendant, a list of actual and potential areas of pollutant contact, or a

23   description of best management practices to be implemented at the Facility to reduce

24   pollutant discharges. According to information available to CSPA, Defendant's SWPPP has

25   not been evaluated to ensure effectiveness and revised where necessary to further reduce

26   pollutant discharges. Plaintiff is informed and believes, and thereupon alleges, that the

27   SWPPP does not include each of the mandatory elements required by Section A of the

28   General Permit. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP

COMPLAINT
                                                          12

1   does not contain an accurate map that clearly delineates the boundaries of the Facility.

2       46.    Information available to CSPA indicates that as a result of these practices,

3 storm water containing excessive pollutants is being discharged during rain events from the

4 Facility directly to a channel that flows into Suisun Bay. Suisun Bay is a part of San

5 Francisco Bay.

6       47.    The San Francisco Bay has been identified by the Regional Board, State Board

7 and federal EPA as impaired for several pollutants, including mercury and unknown toxicity.

8       48.    Plaintiff is informed and believes, and thereupon alleges, that pollutants

9 discharged by the Facility in its storm water are contributing to violations of water quality

10 standards that apply to the San Francisco Bay and its tributaries. Plaintiff is informed and

11 believes, and thereupon alleges, that Defendant is discharging suspended solids, oil and

12 grease, pH and other un-monitored pollutants that are causing or contributing to exceedances

13 of applicable water quality standards. Defendant is contributing to violations of water

14 quality standards including, but not limited to, the narrative water quality standard for

15 toxicity and the numeric water quality standard for electrical conductance.

16       49.    Plaintiff is informed and believes, and thereupon alleges, that, Defendant has

17 failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent

18 with Section A(9) of the General Permit.

19       50.    Plaintiff is informed and believes that Defendant failed to submit to the

20 Regional Board a true and complete annual report certifying compliance with the General

21 Permit since at least December 13, 2002. Pursuant to Sections A(9)(d), B(14), and C(9),

22 (10) of the General Permit, Defendant must submit an annual report, that is signed and

23 certified by the appropriate corporate officer, outlining the Facility's storm water controls

24 and certifying compliance with the General Permit. Plaintiff is informed and believes, and

25 thereupon alleges, that Defendant has signed incomplete annual reports that purported to

26 comply with the General Permit when there was significant noncompliance at the Facility.

27       51.    Information available to Plaintiff indicates that Defendant has not fulfilled the

28 requirements set forth in the General Permit for discharges from the Facility due to the

COMPLAINT

13

1  continued discharge of polluted storm water. Plaintiff is informed and believes, and
2  thereupon alleges, that all of the violations alleged in this Complaint are ongoing and
3  continuing.

4  **VI.    CLAIMS FOR RELIEF**

5
6
7
**FIRST CAUSE OF ACTION**
**Failure to Develop and Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

52.    Plaintiff realleges and incorporate Paragraphs 1-51, as if fully set forth herein.

8
9
53.    The General Permit's SWPPP requirements and Effluent Limitation B(3)
require dischargers to reduce or prevent pollutants in their storm water discharges through

10  implementation of BAT for toxic and nonconventional pollutants and BCT for conventional

11  pollutants. Defendant has failed to implement BAT and BCT at the Facility for its

12  discharges of suspended solids, pH, electrical conductance, oil and grease, and other un-

13  monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

14  54.    Each day since October 1, 1992 that Defendant has failed to develop and

15  implement BAT and BCT in violation of the General Permit is a separate and distinct violation

16  of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

17  55.    Defendant has been in violation of the BAT/BCT requirements every day since

18  October 1, 1992. Defendant continues to be in violation of the BAT/BCT requirements each

19  day that it fails to develop and fully implement an adequate BAT/BCT for the Facility.

20
21
22
**SECOND CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

23  56.    Plaintiff realleges and incorporate Paragraphs 1-55, as if fully set forth herein.

24  57.    Section A and Provision E of the General Permit requires dischargers of storm

25  water associated with industrial activity to have developed and be implementing an adequate

26  SWPPP no later than October 1, 1992.

27  58.    Defendant has failed to develop and implement an adequate SWPPP for the

28  Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the

COMPLAINT
14

1    Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various materials, without

2    appropriate best management practices; the continued exposure of significant quantities of

3    various materials to storm water flows; the continued exposure and tracking of waste resulting

4    from the operation or maintenance of vehicles at the site; the failure to either treat storm water

5    prior to discharge or to implement effective containment practices; and the continued

6    discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark

7    values.

8         59.    Defendant has failed to update the Facility's SWPPP in response to the

9    analytical results of the Facility's storm water monitoring.

10        60.    Each day since October 1, 1992 that Defendant has failed to develop, implement

11   and update an adequate SWPPP for the Facility is a separate and distinct violation of Section

12   301(a) of the Act, 33 U.S.C. § 1311(a).

13        61.    Defendant has been in violation of the SWPPP requirements every day since

14   October 1, 1992. Defendant continues to be in violation of the SWPPP requirements each day

15   that it fails to develop and fully implement an adequate SWPPP for the Facility.

16                              **THIRD CAUSE OF ACTION**
     **Failure to Develop and Implement an Adequate Monitoring and Reporting Program
17        (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

18        62.    Plaintiff re-alleges and incorporates Paragraphs 1-61, inclusive, as if fully set

19   forth herein.

20        63.    Section B of the General Permit requires dischargers of storm water associated

21   with industrial activity to have developed and be implementing a monitoring and reporting

22   program (including, *inter alia*, sampling and analysis of discharges) no later than October 1,

23   1992.

24        64.    Defendant has failed to develop and implement an adequate monitoring and

25   reporting program for the Facility. Defendant's ongoing failure to develop and implement

26   an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to

27   conduct monthly visual observations of storm water discharges.

28        65.    Each day since October 1, 1992 that Defendant has failed to develop and

COMPLAINT
                                          15

1 implement an adequate monitoring and reporting program for the Facility in violation of the

2 General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

3 1311(a). The absence of requisite monitoring and analytical results are ongoing and

4 continuous violations of the Act.

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

66. Plaintiff re-alleges and incorporates Paragraphs 1-65, inclusive, as if fully set forth herein.

67. Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

68. Plaintiff is informed and believes, and thereupon alleges, that since at least December 13, 2002, Defendant has been discharging polluted storm water from the Facility directly to channels or storm drains that flow into the Suisun Bay and the San Francisco Bay, in violation of the Discharge Prohibition A(2) of the General Permit.

69. During every rain event, rainwater flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with these pollutants. The rainwater then flows untreated from the Facility into a channel or storm drain. This contaminated storm water flows into Suisun Bay, a part of the San Francisco Bay.

70. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

71. Plaintiff is informed and believes, and thereupon alleges, that these discharges

COMPLAINT
16

of contaminated storm water are adversely affecting human health and the environment in

violation of Receiving Water Limitation C(1) of the General Permit.

72.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of

contaminated storm water are contributing to the violation of the applicable water quality

standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's

Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

73.     Every day since at least December 13, 2002, that Defendant has discharged and

continues to discharge polluted storm water from the Facility in violation of the General Permit

is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These

violations are ongoing and continuous.

**FIFTH CAUSE OF ACTION**
**False Certification of Compliance In Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

74.     Plaintiff realleges and incorporate Paragraphs 1-73, as if fully set forth herein.

75.     Defendant has falsely certified compliance with the General Permit in each of

the annual reports submitted to the Regional Board since at least June 2002.

76.     Each day since at least June 26, 2002 that Defendant has falsely certified

compliance with the General Permit is a separate and distinct violation of the General Permit

and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of

the General Permit's certification requirement each day that it maintains its false certification

of its compliance with the General Permit.

## VII.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as

alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility

unless authorized by the Permit;

c.   Enjoin Defendant from further violating the substantive and procedural

requirements of the Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.  Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.  Order Defendant to pay civil penalties of $27,500 per day per violation for all violations occurring before March 15, 2004, and $32,500 per day per violation for all violations occurring after August 28, 2002, for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.  Award any such other and further relief as this Court may deem appropriate.

Dated: August 28, 2007          Respectfully submitted,

LAW OFFICE OF MICHAEL R. LOZEAU

By:

Douglas J. Chermak
Attorney for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION
ALLIANCE

COMPLAINT

18

# EXHIBIT A

## California Sportfishing Protection Alliance

*" An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

May 16, 2007

Silvio Garaventa, Jr., Vice President
Contra Costa Waste Service
P.O. Box 5397
Concord, CA 94520

Jim Nejedly, Operations Manager
Recycling Center and Transfer Station
1300 Loveridge Road
Pittsburg, CA 94565

Mary Garaventa
Agent for Service of Process
4080 Mallard Dr.
Concord, CA 94520

### Re: Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act

Dear Messrs. Garaventa, Jr., Nejedly and Ms. Garanventa:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("Act") that CSPA believes are occurring at the Recycling Center and Transfer Station located at 1300 Loveridge Road in Pittsburg, California ("Facility"). CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the Sacramento River, San Joaquin River, the Sacramento-San Joaquin River Delta ("the Delta"), San Francisco Bay and other California waters. This letter is being sent to you as the responsible owners, officers, or operators of the Recycling Center and Transfer Station (all recipients are hereinafter collectively referred to as "Recycling Center").

This letter addresses Recycling Center's unlawful discharge of pollutants from the Facility to waters of the United States. According to the Facility's NOI, it discharges to the City of Pittsburg's municipal storm sewer system and Kirker Creek, which then flow into the San Joaquin River, the Delta and Suisun Bay. The facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State

Water Resources Control Board, Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit"). The WDID identification number for the Facility listed on documents submitted to the State Board and California Regional Water Quality Control Board ("Regional Board") is 2-07S011211. The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violations and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Recycling Center is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violations and Intent to Sue, CSPA intends to file suit in federal court against Recycling Center, Silvio Garaventa, Jr., and Jim Nejedly under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Order. These violations are described more extensively below.

## I.   Background.

On or about August 20, 1997, Recycling Center filed its Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). Recycling Center certified that the Facility is classified under SIC code 4212 ("trucking without storage"). According to the Recycling Center's NOI, the Facility collects and discharges storm water from its 11.7 acre industrial site into one storm drain outlet located at the Facility. Recycling Center discharges storm water to a vegetated channel that, according to the Facility's NOI, is then discharged either to Kirker Creek and the Pittsburg storm drains or both, which then empties into Suisun Bay and the western edge of the Delta.

The Central Valley Regional Water Quality Control Board has identified waters of the Delta as failing to meet water quality standards for unknown toxicity, electrical conductivity, numerous pesticides and mercury. *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf.

The San Francisco Bay Regional Water Quality Control Board (the "Regional Board" or "Board") has established water quality standards for the San Francisco Bay, including Kirker Creek and Suisun Bay, in the "Water Quality Control Plan for the San Francisco Bay Basin," generally referred to as the Basin Plan. *See* http://www.swrcb.ca.gov/rwqcb2/basinplan.htm. The beneficial uses of the Bay region's waters, including Kirker Creek and Suisun Bay, include among others contact and non-contact recreation, municipal and domestic water supply, endangered and threatened species habitat, shellfish harvesting, and fish spawning. The non-contact recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, . . ., camping, boating, . . ., hunting, sightseeing, or aesthetic enjoyment in conjunction with the

Notice of Violations and Intent to File Suit

above activities." Basin Plan at 2.1.16. Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of Suisin Bay, Kirker Creek, and the San Joaquin River and Delta for contact and noncontact water recreation. Pollutant discharges of, for example, high suspended solids and other pollutants in industrial storm water also contribute to the existing impairments of Kirker Creek and the Suisun Bay, including unknown toxicity, high electrical conductivity and low dissolved oxygen.

The Regional Board has established water quality standards for Suisin Bay and its tributaries. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce significant alterations in population or community ecology or receiving water biota." *Id.* at 3.3.8. The Basin Plan also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." *Id.* at 3.3.9. It prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." *Id.* at 3.3.7. The Basin Plan establishes a dissolved oxygen standard of 7.0 mg/L for waters upstream from the Carquinez Bridge. *Id.* at 3.3.5. It limits floating material, stating that "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.6. The Basin Plan incorporates the objectives contained in the State Water Board's 1995 "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary" (*Id.* at 3.5), which establishes a standard for electrical conductivity in the Delta of 0.45 mmhos/cm from April 1 through August 31, as well as less stringent standards for various low flow conditions.

The U.S. Environmental Protection Agency ("EPA") has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Recycling Center: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L, oil & grease ("O&G") – 15 mg/L, aluminum – .75 mg/L, zinc – 0.117 mg/L, iron – 1 mg/L, nitrate + nitrite nitrogen ("N+N") – 0.68 mg/L. The State Water Quality Control Board also has proposed adding a benchmark level to the General Permit for specific conductance (200 μmho/cm).

## II.  Alleged Violations of the NPDES Permit.

### A.  *Discharges in Violation of the Permit.*

Recycling Center has violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water

discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD"), and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Recycling Center has discharged and continues to discharge storm water with unacceptable levels of total suspended solids, specific conductivity, pH, and other pollutants in violation of the General Permit. Recycling Center's sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Concentration | Objective | Benchmark |
|------|-----------|---------------|-----------|-----------|
| 3/20/2006 | TSS | 1190 mg/L | Narrative | 100 mg/L |
| 3/20/2006 | Specific Conductivity | 821 μmho/cm | Narrative | 200 μmho/cm (proposed) |
| 3/20/2006 | O&G | 110 mg/L | Narrative | 15 mg/L |
| 12/1/2005 | TSS | 1870 mg/L | Narrative | 100 mg/L |
| 3/22/2005 | TSS | 1320 mg/L | Narrative | 100 mg/L |
| 3/22/2005 | Specific Conductivity | 670 μmho/cm | Narrative | 200 μmho/cm (proposed) |
| 3/22/2005 | O&G | 32 mg/L | Narrative | 15 mg/L |
| 1/7/2005 | pH | 9.71 | Narrative | 6.0 – 9.0 |
| 1/7/2005 | TSS | 16500 mg/L | Narrative | 100 mg/L |

| 1/7/2005 | Specific Conductivity | 448 µmho/cm | Narrative | 200 µmho/cm (proposed) |
|----------|----------------------|-------------|-----------|------------------------|
| 2/16/2004 | TSS | 770 mg/L | Narrative | 100 mg/L |
| 2/16/2004 | Specific Conductivity | 230 µmho/cm | Narrative | 200 µmho/cm (proposed) |
| 12/5/2003 | TSS | 340 mg/L | Narrative | 610 mg/L |
| 12/13/2002 | TSS | 740 mg/L | Narrative | 100 mg/L |
| 12/13/2002 | Specific Conductivity | 450 µmho/cm | Narrative | 200 µmho/cm (proposed) |

CSPA's investigation, including its review of Recycling Center's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that Recycling Center has not implemented BAT and BCT at the Facility for its discharges of TSS, specific conductivity, O&G, pH and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. Recycling Center was required to have implemented BAT and BCT by no later than October 1, 1992. Thus, Recycling Center is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT. In addition, the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every significant rain event that has occurred since May 16, 2002, and that will occur at the Facility subsequent to the date of this Notice of Violations and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Recycling Center has discharged storm water containing impermissible levels of TSS, O&G, specific conductivity, and pH in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water to each storm drain at or adjacent to the Facility containing any of these pollutants constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Recycling Center is subject to penalties for violations of the General Permit and the Act since May 16, 2002.

**B.**     *Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.*

Section A(1) and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the General Permit to continue following their existing SWPPP and implement any necessary

revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's investigation of the conditions at the Facility as well as Recycling Center's Annual Reports indicate that Recycling Center has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Recycling Center has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Recycling Center has been in continuous violation of Section A and Provision E(2) of the General Permit every day since at least May 16, 2002, and will continue to be in violation every day that Recycling Center fails to develop and implement an effective SWPPP. Recycling Center is subject to penalties for violations of the Order and the Act occurring since May 16, 2002.

## C. *Failure to Conduct Monthly Visual Observations of Storm Water Discharges*

Section B(4)(a) of the General Permit requires dischargers of storm water to conduct visual observations of storm water discharges for one storm event per month during the wet season. The observations must take place during the first hour of the discharge. Section B(4)(b) indicates that the observations are only required of discharges that occur during scheduled facility operating hours and during daylight hours preceded by three working days without storm water discharges. Section B(4)(c) requires the SWPPP to be revised based on the observations and implemented in accordance with Section A of the General Permit (described above). Based

Notice of Violations and Intent to File Suit

on information and belief, Recycling Center has failed to conduct visual observations of storm water discharges during qualifying storm events for the following months: November, 2002; December, 2002; January, 2003; March, 2003; April, 2003; November, 2003; February, 2004; March, 2004; May, 2004; October, 2004; November, 2004; February, 2005; May, 2005; November, 2005; March, 2006; April, 2006; May, 2006.

## D. Failure to File True and Correct Annual Reports.

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

For at least the last five years, Recycling Center and its agent, Jim Nejedly, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit. Consequently, Recycling Center and Mr. Nejedly have violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Recycling Center or its agent failed to submit a complete or correct report and every time Recycling Center or its agents falsely purported to comply with the Act. Recycling Center is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since July 1, 2002.

## IV. Persons Responsible for the Violations.

CSPA puts Recycling Center, Silvio Garaventa, Jr., and Jim Nejedly on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Recycling Center, Silvio Garaventa, Jr., and Jim Nejedly on notice that it intends to include those subsequently identified persons in this action.

## V. Name and Address of Noticing Party.

Our name, address and telephone number is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, CA 95204
Tel. (209) 464-5067

## VI. Counsel.

Notice of Violations and Intent to File Suit

CSPA has retained legal counsel to represent it in this matter. Please direct all communications to:

Michael R. Lozeau
Douglas J. Chermak
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, California 94501
Tel. (510) 749-9102
mrlozeau@lozeaulaw.com

Andrew L. Packard
Michael Lynes
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, California 94952
Tel. (707) 763-7227
andrew@packardlawoffices.com

## VII.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Recycling Center to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the Act against Recycling Center and its agents for the above-referenced violations upon the expiration of the 60-day notice period. However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Tom Howard, Acting Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Alberto Gonzalez, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

## ATTACHMENT A
## Rain Dates, Recycling Center, Pittsburg, CA

| Month | Day | Year | Month | Day | Year | Month | Day | Year |
|---|---|---|---|---|---|---|---|---|
| | | | February | 26 | 2004 | December | 21 | 2005 |
| November | 07 | 2002 | March | 01 | 2004 | December | 22 | 2005 |
| December | 09 | 2002 | May | 28 | 2004 | December | 25 | 2005 |
| December | 14 | 2002 | October | 19 | 2004 | December | 27 | 2005 |
| December | 16 | 2002 | October | 23 | 2004 | December | 28 | 2005 |
| December | 20 | 2002 | October | 24 | 2004 | December | 30 | 2005 |
| December | 21 | 2002 | November | 03 | 2004 | December | 31 | 2005 |
| December | 27 | 2002 | November | 09 | 2004 | January | 01 | 2006 |
| December | 30 | 2002 | November | 10 | 2004 | January | 02 | 2006 |
| January | 09 | 2003 | November | 11 | 2004 | January | 18 | 2006 |
| January | 10 | 2003 | December | 06 | 2004 | January | 30 | 2006 |
| January | 21 | 2003 | December | 07 | 2004 | February | 17 | 2006 |
| March | 14 | 2003 | December | 08 | 2004 | February | 26 | 2006 |
| March | 16 | 2003 | December | 27 | 2004 | February | 27 | 2006 |
| March | 22 | 2003 | December | 28 | 2004 | March | 02 | 2006 |
| April | 03 | 2003 | December | 29 | 2004 | March | 03 | 2006 |
| April | 12 | 2003 | December | 30 | 2004 | March | 06 | 2006 |
| May | 02 | 2003 | December | 31 | 2004 | March | 11 | 2006 |
| May | 03 | 2003 | January | 01 | 2005 | March | 13 | 2006 |
| August | 21 | 2003 | January | 02 | 2005 | March | 17 | 2006 |
| November | 06 | 2003 | January | 06 | 2005 | March | 18 | 2006 |
| November | 08 | 2003 | January | 07 | 2005 | March | 21 | 2006 |
| November | 15 | 2003 | January | 08 | 2005 | March | 25 | 2006 |
| November | 30 | 2003 | January | 10 | 2005 | March | 28 | 2006 |
| December | 01 | 2003 | January | 11 | 2005 | March | 29 | 2006 |
| December | 04 | 2003 | January | 25 | 2005 | April | 03 | 2006 |
| December | 06 | 2003 | January | 27 | 2005 | April | 04 | 2006 |
| December | 09 | 2003 | February | 14 | 2005 | April | 05 | 2006 |
| December | 10 | 2003 | February | 15 | 2005 | April | 11 | 2006 |
| December | 13 | 2003 | February | 17 | 2005 | April | 12 | 2006 |
| December | 19 | 2003 | February | 19 | 2005 | April | 13 | 2006 |
| December | 22 | 2003 | February | 20 | 2005 | April | 17 | 2006 |
| December | 23 | 2003 | February | 26 | 2005 | May | 21 | 2006 |
| December | 24 | 2003 | February | 27 | 2005 | November | 01 | 2006 |
| December | 26 | 2003 | March | 01 | 2005 | November | 03 | 2006 |
| December | 28 | 2003 | March | 03 | 2005 | November | 10 | 2006 |
| December | 29 | 2003 | March | 18 | 2005 | December | 14 | 2006 |
| January | 01 | 2004 | March | 19 | 2005 | December | 21 | 2006 |
| January | 02 | 2004 | March | 21 | 2005 | January | 28 | 2007 |
| January | 06 | 2004 | March | 22 | 2005 | February | 08 | 2007 |
| January | 23 | 2004 | March | 27 | 2005 | February | 09 | 2007 |
| February | 02 | 2004 | April | 08 | 2005 | February | 10 | 2007 |
| February | 03 | 2004 | April | 27 | 2005 | February | 12 | 2007 |
| February | 15 | 2004 | May | 07 | 2005 | February | 22 | 2007 |
| February | 16 | 2004 | May | 08 | 2005 | February | 25 | 2007 |
| February | 17 | 2004 | November | 28 | 2005 | February | 26 | 2007 |
| February | 18 | 2004 | November | 30 | 2005 | February | 27 | 2007 |
| February | 21 | 2004 | December | 17 | 2005 | April | 14 | 2007 |
| February | 24 | 2004 | December | 18 | 2005 | April | 21 | 2007 |
| February | 25 | 2004 | December | 20 | 2005 | April | 22 | 2007 |

Notice of Violations and Intent to File Suit